**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Albert WILSON, Defendant–Appellant.**

**No. 90–5229.**

United States Court of Appeals,
Fourth Circuit.

Argued June 7, 1991.

Decided Dec. 19, 1991.

As Amended Dec. 31, 1991.

Joseph N. Bowman, Alexandria, Va., argued, for defendant-appellant.

Steven George Bonorris, Sp. Asst. U.S. Atty., Alexandria, Va. (Henry E. Hudson, U.S. Atty., William G. Otis, Sr. Litigation Counsel, on brief), for plaintiff-appellee.

Before ERVIN, Chief Judge, HALL, Circuit Judge, and GARBIS, U.S. District Judge for the District of Maryland, sitting by designation.

## 118

### OPINION

K.K. HALL, Circuit Judge:

Albert Wilson appeals his conviction for possession of cocaine base with intent to distribute. Although he pleaded guilty, he reserved his right to appeal the denial of his motion to suppress. We hold that the district court erred in refusing to suppress evidence of the drugs, and we vacate the conviction and remand for further proceedings.

### I.

At about 3:00 p.m. on April 4, 1990, Wilson disembarked from the New York shuttle at National Airport outside Washington, D.C. He was carrying two coats and a carry-on luggage bag. As he was leaving the terminal, he was approached by Douglas Crooke, a Fairfax County, Virginia, policeman and a member of the Drug Enforcement Agency's task force engaged in monitoring passengers at the airport. Accompanied by fellow task force officers Mike Rogers and Charles Prince, Crooke identified himself as a police officer and asked if Wilson would speak to him. Wilson agreed to do so.

Crooke asked if Wilson had just come off a flight from New York, and Wilson said that no, he had just arrived from Boston. Upon request for identification, Wilson produced a card that he said he used to cash checks. Wilson responded to further inquiries by telling officer Crooke that he lived in Washington but was transferring to school in Boston.

Crooke then explained the DEA's purpose in monitoring flights and asked Wilson if he was carrying guns. Wilson said no, but he did permit Crooke to search his carry-on bag. While Crooke was searching the bag, Wilson approached officer Prince and asked whether he (Prince) would like to search his person. Prince then patted him down. Each of these searches produced nothing. Crooke then testified at the suppression hearing about the ensuing events:

A. I then handed the bag back to him. And before I could ask him, he picked up the two coats off the chair. I asked him if I may search the coats. And in an angry tone he replied back to me, no, you had your chance, and I wasn't permitted to search them.

Q. What did you do then?

A. He started to walk away. And I began to reason with him. I said, I don't understand why you won't let me search the two coats when you just allowed us to search your person and the bag. I didn't understand the reasoning behind that. And he began, you know, replying again in an angry tone that we were harassing him and we were stopping him and there was some things in there he didn't want us to see. I said, what was in there? And he said there were some private things that he didn't want us to see. And he again said, why are you stopping me? I said, I am not stopping you, you are free to leave, you can leave if you like.

Q. During this encounter when you asked to search the coat, he said no, and was asking about the harassment, where were you physically and what were you doing? Was he walking out of the terminal?

A. He had started walking towards the exit of the terminal, and I was walking beside him.

Q. Where was Officer Prince at that point?

A. He was still standing back in the hallway area of the main terminal.

Q. Approximately how far, if you can recall?

A. Maybe within ten feet.

Q. Okay. What about Officer Rogers?

A. I don't know. I think he was up in the area at that time. I don't know if he was right in that immediate vicinity though.

Q. Okay. So, then what happened?

A. He again asked if we were stopping him. And I said no, he was free to leave. And then I asked, well, if you won't let me search your coat, would you mind if a drugsniffing dog screened your coat. He said, sure. I said, well, would you mind coming down to the police sta-

tion with us so we can get a dog? And he said no. And then he again proceeded to go out the exit going to the sliding doors that would take you down a sidewalk towards the main parking area and taxi-stand lines. It was as he was walking out of those doors carrying the two coats that I noticed the brown suede coat had a bulge coming from one of his pockets.

Q. Would you please describe that bulge.

A. It was—He was carrying the two coats in his hand, which would cause the rest of the coat to sag down behind it. And then inside the one pocket I noticed it caused the flap of the pocket to kind of puff out some. And it caused a noticeable sag within the coat in that one region of the pocket.

Q. Approximately what was the size of that bulge?

A. I could only by showing my hands, my hands cupped together like-

Q. A little bigger than a softball?

A. Approximately the size of a softball.

Q. What happened next?

A. After noticing that bulge I followed him out of the terminal and again began to ask him why, why he would not allow us to search the coat, it would take less time than it did to search the book bag. And all I was asking to do was just pat the coat down and he would be on his way. He kept insisting that he was late for an appointment that he had at 3 o'clock. And I explained him, I said, your flight came in at 10 minutes, 15 minutes after 3, so you are already late, and what I am asking to do would only take but a second.

And then this persisted as we walked down the hallway or down the sidewalk. And he continued and continued to say that we were stopping him, harassing him. And his voice began getting very loud. People in the sidewalk began looking towards us. And some people had gathered. And this just persisted. And we had to ask him on numerous occa-

sions to lower his voice and speak to us in a similar tone.

Q. Would he do that?

A. He would do it, and then as we would start questioning him again, asking him the reason, he would continue to escalate the volume of his voice. And he had to be asked numerous times by myself and by Officer Rogers to please quiet down because we were speaking to him in a normal tone and he was just again talking very loud, boisterous.

Q. Okay. What happened next?

A. We got to the sidewalk, and we were persisting with the same questions. I said, why would you not just allow us to search it. And eventually he agreed to allow us to search the coat. He held his brown coat out in front of him like this. And I reached directly for the pocket that I saw the bulge. And I could feel a large lump inside. And I felt that it was wrapped in paper, because I heard the paper crumbling. I looked at him and I asked him what this was. And he said he didn't know. He had kind of a scared look on his face. As I went to reach my hand in the pocket, he snatched the coat out of my hands, leaped a railing that separated the walk from the traffic lanes for the taxi cabs. And as he was dangling over the railing, Officer Rogers grabbed his foot. And he began kicking at Officer Rogers. Officer Rogers let go. Mr. Wilson broke free and started to run. And we jumped over the railing and gave chase.

Q. And you caught him?

A. Yes. He eventually ran into a fenced-in corner of the park lot in the corner.

Q. What happened after you apprehended him?

A. He had run around a vehicle that was parked in this parking lot. And when he was on the far side of the vehicle I saw the brown coat go sailing up into the air, he threw it up into the air.

Q. Was he still running at that time?

A. Not at full speed. He was moving at a quick pace around the cars as fast as

you could probably run in between parked cars. And after the coat went into the air, he came around the other side of the car that was closest to us with his hands in the air and surrendered. And we ordered him to the ground with our weapons drawn.

Q. Did he make statements at that time?

A. As he was on the ground he yelled out something to the effect that the stuff wasn't even his, he was supposed to deliver it to somebody.

Q. And you arrested him and took him to the airport police station?

A. Yes. He was arrested by myself and Officer Rogers.

Q. Okay. And did you search the coat?

A. Yes.

Q. What did you find in the coat?

A. In the pocket that I felt I pulled out a brown paper bag. Inside that paper bag was what I recognized as crack cocaine.

It was later determined that the bag contained about 110–115 grams of cocaine base wrapped in a plastic bag.

In denying the suppression motion, the district court ruled from the bench "that there was reasonable suspicion for the stop here and the search that is contested, and probable cause to do so." The court explained that the officers had "reasonable suspicion and probable cause" that Wilson "was trafficking narcotics and had them in his possession at that time."

Under a plea agreement, Wilson conditionally pleaded guilty to one count of possession with intent to distribute more than fifty grams of cocaine base, but he reserved the right to appeal the denial of his suppression motion. He was sentenced under the Sentencing Guidelines to 121 months. The sole issue on appeal is whether the cocaine should have been suppressed.

## II.

The facts in this case present an unusual variant on the increasingly common theme of random police-citizen encounters and warrantless searches of persons or their belongings. We hold that the officer's repeated requests to search the coats after Wilson's vigorous denials converted the encounter into a *Terry*-type [1] seizure well before the point at which Wilson held his coat out to be searched. Because the seizure was not based on reasonable suspicion, the seizure was illegal. Whether Wilson consented to the search of the coat, an issue not reached by the district court, is immaterial. The illegality of the seizure infected the search, and the evidence must be suppressed.

### A.

The threshold questions are whether a seizure even occurred and, if so, when. Only if a seizure took place does the Fourth Amendment come into play. If Wilson was seized by the police, the next question is whether the seizure was a justifiable one. Our first task, however, is to parse the lower court's ruling to determine what findings of fact and conclusions of law were reached.

The district court concluded that a stop or seizure had occurred, but that it was founded on "reasonable suspicion or probable cause." The district court's determination was apparently based on the following unrebutted evidence: (1) Wilson's arrival from New York, a "known source city" for drugs; (2) Wilson's eye contact with the agent, looking back up to three times as he was riding the escalator, and turning and looking directly at Crooke as he (Wilson) reached the top; (3) Wilson's false statement that he was coming from Boston; (4) Wilson's failure to produce any identification other than a check-cashing card; and (5) Crooke's observation of a bulge in Wilson's coat pocket. In the bench ruling, the court also noted that Wilson denied the request to search his coat and "reacted in a very loud voice that the officers had had their chance and took his coat off and kept

1. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

walking off." Inasmuch as the only evidence is officer Crooke's testimony, we accept these findings to the extent they are observable facts.

The district court also found that consent ended when Wilson first refused to allow a search of his coats. In sum, the court ruled that a seizure (or an arrest) was effected, but that it was a legally justified one. The district court, however, described neither when the seizure took place nor at what point it became justified.

### B.

■ There currently exists a circuit split on what standard should be used by appellate courts in reviewing a district court's determination of whether a "seizure" has occurred. *See United States v. Valdiosera–Godinez*, 932 F.2d 1093, 1098 n. 1 (5th Cir.1991) (collecting cases). We have adopted the view that the question is one of fact, and, as such, is subject to reversal only if clearly erroneous. *United States v. Gordon*, 895 F.2d 932, 937 (4th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 131, 112 L.Ed.2d 98 (1990). Whether a seizure occurred depends on the totality of the circumstances, and the test has an objective component to the extent that it is a reasonable person's interpretation of the police conduct that is determinative. *Id.* In other words, if the hypothetical reasonable person would have felt free to ignore officer Crooke's questions and go on his way, no seizure occurred.

### C.

This case raises the question of the effect of a person's unsuccessful attempt to terminate what began as a consensual encounter. The encounter commenced when Crooke first approached Wilson. The district court found, and we agree, that the consensual stage of the encounter terminated when Wilson denied Crooke's first request to search the coats. Up to the point of refusal, Wilson's contact with the police involved nothing more than a garden-variety airport encounter and consensual search. Our inquiry focuses on the events subsequent to the initial refusal.

Whether a seizure occurred at all is an intensely fact-bound matter, but our task is simplified because we have a single unrebutted and fully accredited version of the facts, *i.e.*, Officer Crooke's testimony.

■ The Supreme Court revisited this general issue most recently in *Florida v. Bostick*, —— U.S. ——, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). In *Bostick*, the Court reiterated the now-familiar rule that "the Fourth Amendment permits police officers to approach individuals at random in airport lobbies and other public places to ask them questions and to request consent to search their luggage, so long as a reasonable person would understand that he or she could refuse to cooperate." *Id.* 111 S.Ct. at 2384. The initiation of such an encounter need not be predicated on any suspicion of the person's involvement in wrongdoing; it is consensual as long as the citizen voluntarily cooperates with the police. Such an encounter "will not trigger Fourth Amendment scrutiny, unless it loses its consensual nature." *Id.* at 2386.

Once a citizen withdraws his consent to further questioning by the police, the reasonableness of any subsequent "governmental invasion of a citizen's personal security" is gauged by the Fourth Amendment. *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). An early case looked to whether "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen such that he is not free to walk away." *Id.* at n. 16. Faced with situations involving police conduct that stopped short of actual physical restraint, the Court articulated an objective test which asked whether the police conduct would have led a reasonable person to believe that "he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.). This "free to leave" test is now used by the courts in determining whether particular police-citizen encounters should be placed in the realm of Fourth Amendment "seizures."

Over the years, the courts have been confronted with a variegated array of "encounters." In *I.N.S. v. Delgado*, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984), and most recently in *Florida v. Bostick*, — U.S. —, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), the Court addressed the issue in the context of encounters in which the citizen was more or less constrained from walking away by a factor other than the actions of the police. In *Delgado*, the workers being questioned in their work place were restricted from leaving by their "voluntary obligations to their employer" to remain on the job. 466 U.S. at 218, 104 S.Ct. at 1763. Similarly, the movement of the bus passenger in *Bostick* was restricted not by the police but, rather, "as the natural result of his decision to take the bus." 111 S.Ct. at 2387. The Court in *Bostick* stated that the words "free to leave" embodied a principle and that "the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id.* Explaining how this inquiry should proceed, the Court stated that "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Id.* (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569, 108 S.Ct. 1975, 1977, 100 L.Ed.2d 565 (1988)). This "free to leave" principle has also been described as "no reason to believe that they would be detained if they gave truthful answers to the questions put to them or if they simply refused to answer," *Delgado*, 466 U.S. at 218, 104 S.Ct. at 1763, or "decline to listen to the questions at all and ... go on his way." *Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983). This court has explained that "freedom to leave means fundamentally the freedom to break off contact, in which case officers must, in the absence of objective justification, leave the passenger alone." *United States v. Flowers*, 912 F.2d 707, 712 (4th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 2895, 115 L.Ed.2d 1060 (1991).

■ Notwithstanding its occurrence in a public concourse at a busy airport, Wilson's encounter includes the essential element in *Delgado* and *Bostick*, but with a new twist. Wilson was not physically restrained by the police or by other factors from moving through the airport terminal, but the persistence of Crooke and his fellow officers would clearly convey to a reasonable person that he was not "free to leave" the questioning by the police. The fact that Wilson continued walking through the airport is not dispositive. Despite his best efforts, Wilson was unable to "terminate the encounter," "to ignore the police presence and go about his business," or to "go on his way." The coercive effect of the policemen's actions must be evaluated in light of Wilson's response. No one would seriously dispute that Wilson had a right to attempt to fend off his inquisitors in the manner he did, and it is not contended that it was unreasonable for Wilson to do so. We see no material distinction between the worker in his factory, the bus passenger in his seat, and the exiting Wilson unable to shake his inquisitors. Had the police officer in *Bostick* stood over the bus passenger for ten minutes and "reasoned" with him between the passenger's angry outbursts, the result in that case would likely have been different. The principle embodied by the phrase "free to leave" means the ability to ignore the police *and* to walk away from them.

### D.

The Supreme Court pointed out in *California v. Hodari D.*, — U.S. —, 111 S.Ct. 1547, 1551, 113 L.Ed.2d 690 (1991), that the conveyance by the police of the message that a suspect was not "free to leave" does not necessarily end the inquiry. This is only a *"necessary,* but not a *sufficient* condition for seizure ... effected through a 'show of authority.'" To have a completed seizure, the suspect must also have submitted to the policeman's authority. The instant case is unusual in that it combines the suspect's apparently unimpeded progress toward his destination with his concomitant efforts to bring an end to

the questioning. Physical movement alone does not negate the possibility that a seizure may nevertheless have occurred.

The government argues, somewhat disingenuously in our view, that "Wilson preferred to stay engaged in a running argument rather than just leave." Appellee's Brief at 9. The totality of circumstances, as conveyed by the government's witness, paints a very different picture. By officer Crooke's own testimony, Wilson "continued and continued to say we were stopping him, harassing him." Wilson twice refused Crooke's requests "in an angry tone," and "on numerous occasions" the agents had to ask him to lower his voice. Once Wilson did lower his voice, however, "we [the agents] would start questioning him again, asking him the reason, [and] he would continue to escalate the volume of his voice." Again, Crooke testified that he and officer Rogers had to ask him "numerous times" to quiet down. Wilson was so loud that "people ... began looking at us [a]nd some people had gathered." Yet after all this, Crooke said that when they reached the sidewalk, "we were persisting with the same questions." Crooke later added that Wilson's movements were never impeded and that he (Wilson) "walked away from us I would say at least four occasions." This police behavior is the type of state interference with personal security that the Fourth Amendment proscribes.

We restate the issue: Does continued police questioning, after the suspect has conveyed an unequivocal unwillingness to engage in further conversation, transform the encounter into a seizure? We hesitate to lay down a *per se* rule that subsequent efforts by the police to maintain contact with the suspect, after being rebuffed, would amount to a seizure. *See Guadalupe v. United States*, 585 A.2d 1348, 1361 n. 28 (D.C.App.1991) (rejecting *per se* rule that a second encounter with a suspect is under all circumstances a seizure). Our hesitation is grounded in the focus on both the "coercive effect" of the police conduct

in question and the condition that there be some submission to the police. *See United States v. Hooper*, 935 F.2d 484, 489 (2nd Cir.1991) ("[A] 'seizure' for the purposes of the fourth amendment is not defined by whether an individual has halted his forward progress in response to police conduct, but rather is defined by the coercive nature of the police conduct.") A suspect's termination of what began as a consensual encounter does not in and of itself act to imbue any subsequent police contact with the degree of coerciveness necessary for a finding of a seizure, and subsequent contact by the police does not mean that the suspect has submitted. It is clear, however, that police persistence in such a situation strongly conveys, "when objectively viewed, an intention not to desist." *Guadalupe*, 585 A.2d at 1359. Such persistence may be the functional equivalent of physical restraint, which, in the absence of justification, is proscribed by the Fourth Amendment. Such prolonged questioning, leading as it did to the vigorous efforts by Wilson in response, is surely among the types of "egregious police behavior" that the Fourth Amendment is meant to deter. *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 1588, 104 L.Ed.2d 1 (Marshall, J., dissenting).

In sum, Wilson was "seized" for Fourth Amendment purposes. The officer's prolonged and persistent questioning after the suspect had conveyed an unequivocal unwillingness to engage in further conversation with the officer is the type of conduct that is proscribed by the Fourth Amendment. We conclude, therefore, that Wilson was "seized" sometime soon after he denied the agent's request to search the coat.[2]

### III.

■ Even if a *Terry*-type seizure was effected by the police at some point prior to Wilson's flight, suppression of the cocaine could be denied if the seizure was justified.

---

**2.** *United States v. Gray*, 883 F.2d 320 (4th Cir. 1989), a case heavily relied upon by the government, is not controlling. In *Gray*, there was no effort whatsoever by the suspect to terminate the police-initiated encounter, and the encounter clearly remained consensual from the first approach of the police through the suspect's voluntary consent for a search of his person.

"[I]t is only when an encounter is classified as a seizure that the court must determine whether there was reasonable suspicion." *United States v. Gordon,* 895 F.2d 932, 937 (4th Cir.1990). The district court ruled that the agent's observation of the bulge in Wilson's coat pocket, together with "all the other facts" found by the court, justified a seizure and an arrest. We will restrict our discussion to whether a seizure was justified; if there was insufficient justification for a brief detention, the higher threshold for an arrest was obviously not reached.

### A.

"An appellate court must make an independent determination on the issue of the legality of an arrest...." *United States v. McCraw,* 920 F.2d 224, 227 (4th Cir. 1990). We are obliged to use an objective yardstick to determine whether the seizure was supported by "at least a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Reid v. Georgia,* 448 U.S. 438, 440, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980). On appeal, we must consider "the totality of the circumstances—the whole picture" in determining the validity of a seizure. *Sokolow,* 109 S.Ct. at 1585.

### B.

The necessary level of suspicion for a brief investigatory detention is appreciably less than the prerequisite level for a finding of probable cause. *Id.* Even a series of lawful acts may, when viewed together, form the basis for reasonable suspicion. *Reid v. Georgia,* 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980). The observations of Officer Crooke do not satisfy this test.

We note at the outset that there was no mention of "drug profile" during the suppression hearing, so we are not faced with integrating that protean concept into our analysis. *See Sokolow,* 109 S.Ct. at 1588–89 (Marshall, J., dissenting) (referring to "the profile's 'chameleon-like way of adapting to any particular set of circumstances.'") (quoting *United States v. Sokolow,* 831 F.2d 1413, 1418 (9th Cir.1987)).

Officer Crooke, for instance, did not testify that the identification produced by Wilson was of a type often carried by drug couriers. Crooke also did not attempt to link the bulge in Wilson's coat pocket to similar practices by other drug couriers. Thus, we are unable to draw any inferences that might otherwise be permissible had Crooke elaborated on the various factors that went into his decision to pursue Wilson. *See United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981) (police officer's special training and experience permits inference of criminal activity sufficient to create reasonable suspicion); *see also United States v. Gooding,* 695 F.2d 78, 82 (4th Cir.1982) (although trained law enforcement officers may be able to perceive suspicious conduct not visible to an untrained observer, "any such special meaning must be articulated to the courts and its reasonableness as a basis for seizure assessed independently of the police officers' subjective assertions...."). No such "special meaning" was articulated by Crooke, a police officer who had seven years of law enforcement experience, including 1½ years of experience with the airport drug interdiction task force.

Thus, while we accept the bare factual findings of the court, *e.g.,* that Wilson's coat did have a softball-sized bulge in the pocket, we are not able to give additional weight that might otherwise have been accorded these facts had they been presented in terms of what they meant to this particular policeman. *See United States v. Aguiar,* 825 F.2d 39, 41 (4th Cir.) (observation of bulge at suspect's ankle, in combination with other drug profile characteristics as well as officer's testimony that he "had observed other passengers' [sic] with bulges at the ankles and that on each occasion it turned out that the bulge was a packet of illegal drugs," held to constitute probable cause for arrest), *cert. denied,* 484 U.S. 987, 108 S.Ct. 505, 98 L.Ed.2d 503 (1987).

In seizure cases in which justification of the police action is placed in issue, some factual components of the asserted "reasonable suspicion" appear regularly. Very often a confidential tip has been received

by the police, and reliable tips are normally accorded substantial weight by the court. A suspect's arrival from a "source city" is still noted by many courts as a factor lending support for a "reasonable suspicion" finding, but the vast number of persons coming from those "source cities" relegates this factor to a relatively insignificant role. *See United States v. Taylor*, 917 F.2d 1402, 1410 (6th Cir.) ("Travel to and from an alleged source city ... is inherently insuspicious behavior."), judgment vacated and rehearing en banc granted, 925 F.2d 990 (1990). The instant case, however, presents none of the more probative indicia found in the numerous reported airport cases.

Although we believe that the seizure of Wilson occurred prior to Crooke's observation of a bulge in his coat pocket, the uncertainty about how much time transpired during the confrontation persuades us to discuss the role of the bulge. The bulge is not the sort of observation that has any significance. A coat pocket is a quite usual location for a bulky object, and there is no indication that Wilson attempted to obscure the agents' view of the bulge. *See United States v. Millan*, 912 F.2d 1014, 1017 (8th Cir.1990) (observation of two bulges in suspect's inner coat pockets not of a suspicious nature). Our decisions that mention bulges as a factor in the reasonable-suspicion analysis all involve attempts by a suspect to hide the bulge and/or the observation of a bulge in an unusual location. *See United States v. Harrison*, 667 F.2d 1158 (4th Cir.) (4–6 inch bulge on suspect's back under his coat a factor lending support for "reasonable suspicion"), *cert. denied*, 457 U.S. 1121, 102 S.Ct. 2937, 73 L.Ed.2d 1335 (1982); *United States v. Lehmann*, 798 F.2d 692 (4th Cir. 1986) (officer's observation of rounded corners of a package showing through suspect's pants in the crotch area, plus suspect's attempts to conceal the bulge by pulling down his jacket in front, justified seizure); *United States v. Aguiar*, 825 F.2d 39 (4th Cir.1987) (large bulge on suspect's ankle one factor adding up to probable cause for arrest); *United States v. Powell*, 886 F.2d 81 (4th Cir.1989) (softball-

sized bulge in front pocket one of numerous drug profile characteristics met by suspect; these characteristics, in conjunction with suspect's attempted flight and statement that "it's [the bulge] bad," gave police probable cause for an arrest), *cert. denied*, 493 U.S. 1084, 110 S.Ct. 1144, 107 L.Ed.2d 1049 (1990). In *Powell*, the bulge caused the suspect to walk in "an awkward, bowlegged fashion, typical of one carrying concealed illicit drugs," *id.* at 82, so the elements of attempted concealment and unusual location were both present.

Although Wilson arrived from New York, produced only a "check cashing" card for identification, and glanced back at Officer Crooke a few times, these facts do not combine to yield the necessary quantum of "reasonable suspicion" for even the briefest detention. The "particularized ground for suspecting ... criminal conduct," if such ground exists at all, lies in Wilson's false statement that he was coming from Boston. *United States v. Lehmann*, 798 F.2d 692, 694 (4th Cir.1986).

Wilson's denial that he had just exited a plane from New York is suspicious, but of what is unclear. We are neither apprised of what, if any, significance such a falsehood normally has in the illicit drug trade, nor what inferences, if any, Officer Crooke drew from Wilson's denial of having arrived on the New York shuttle. "[B]efore detaining an individual, law enforcement officers must reasonably suspect that he is engaged in, or poised to commit, a criminal act *at that moment.*" *Sokolow*, 109 S.Ct. at 1588 (Marshall, J., dissenting). Without stronger articulable grounds of ongoing criminal behavior, this falsehood is simply not sufficient cause for what we have already determined was a seizure of Wilson. *See id.* at 1586 ("But certainly instances are conceivable in which traveling under an alias would not reflect ongoing criminal activity...."); *see also Aguiar*, 825 F.2d at 41 (characterizing as a "drug profile characteristic" the suspect's use of an airplane ticket issued in a false name).

██ We are left with the unavoidable impression that the real reason for the persistent questioning, *i.e.*, the seizure,

was Wilson's refusal to allow a search of his coat. The government, however, avoids the obvious pitfall of positing the denial itself as a basis for suspicion and instead points to the particular wording of the reply. Appellee's Brief at 12. As recounted by Officer Crooke: "I asked him if I may search his coats. And in an angry tone he replied back to me, no, you had your chance, and I wasn't permitted to search them." After some time, Wilson stated that "there were some things in there he didn't want us to see ... [,] some private things he didn't want us to see...." The government does not suggest what form of denial would not have contributed to the officer's suspicion. *Cf. Buffkins v. City of Omaha,* 922 F.2d 465 (8th Cir.1990) (after refusing to allow a search of her teddy bear, suspect directed a mild epithet at the policeman and was arrested for disorderly conduct; the incident search uncovered no illicit drugs). The ominous implication in this argument is that only guilty persons have anything to keep from the eyes of the police. We are wary of allowing the exercise of the unequivocal right to ignore the police to be grafted onto the "reasonable suspicion" analysis.

We are not prepared, however, to rule that the form of a denial can *never* be included as a factor to be considered in determining whether an investigative stop was justified. Our concern in this case, however, is the prominence it has as a factor upon which Officer Crooke's "objectively reasonable suspicion of involvement in criminal wrongdoing" was evidently based. After Wilson's initial refusal to allow a search of his coats, the officers were faced with a young man who denied having come off the New York shuttle, who had glanced back a few times, and who, when requested, produced an identification card and consented to a search of his person and his luggage in the public concourse of a busy airport. As we have already noted, these facts alone do not suffice to justify the seizure. *See Reid,* 448 U.S. at 441, 100 S.Ct. at 2754 (no reasonable suspicion when person arrived on early morning flight from known narcotics source city and glanced repeatedly back to another passen-

ger). Whether the denial of the search request pushes the situation into the realm of "reasonable suspicion" is the issue stripped to its barest essentials.

Important law enforcement interests sometimes justify a "limited intrusion on the personal security of [a] suspect[ ]" on less than probable cause. *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). We have no occasion to examine whether Crooke and his fellow agents "employed the least intrusive means available to verify or dispel the officer's suspicion." *Id.* The lack of a legitimate basis for the seizure obviates the need to examine whether the police acted reasonably notwithstanding the illegality of the seizure; a finding that a seizure occurred precludes any argument that it was a "reasonable" detention despite a prior lack of justification. Of course, the police may not rely on events or observations subsequent to the commencement of the seizure to bolster the argument that they had reasonable suspicion. *See Sibron v. New York,* 392 U.S. 40, 63, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (1968) ("[A]n incident search may not precede an arrest and serve as part of its justification.")

The police may initiate an encounter without any suspicion, and as long as the person consents, the police may continue to engage the suspect. When the person's consent is withdrawn, however, something more than a hunch is required before the person's freedom may be inhibited. To permit the government to use the fruits of the police conduct in this case would bring us far down the road to allowing the limited *Terry* exception to swallow the rule. If, on evidence such as this, police were permitted to disregard a suspect's attempts to ignore further questioning and to persist until "reasonable suspicion" was created or consent given, the Fourth Amendment would be greatly diminished in its intended role as the bulwark against "overbearing or harassing" police conduct, *Terry v. Ohio,* 392 U.S. 1, 15, 88 S.Ct. 1868, 1876, 20 L.Ed.2d 889 (1968).

Even when viewed in the light most favorable to the government, this evidence

 

does not convince us that Crooke had a "reasonable and articulable suspicion" of ongoing criminal involvement as would justify the restraint on Wilson's freedom. "Reasonable suspicion" does not equate with "some" suspicion of wrongdoing. Drug interdiction efforts, such as the one in which Crooke and his fellow officers were involved, are no doubt effective methods for stanching the flow of drugs throughout the nation. The Fourth Amendment, however, guarantees that the liberty of even the criminals among us will not be restrained without an objectively reasonable basis. In Wilson's case, that level of suspicion was not reached prior to the point at which his freedom was restrained. "To hold otherwise would begin to transform this free society into one where travelers must present papers or proffer explanations to be on their way." *Flowers*, 912 F.2d at 712.

### IV.

■ The government posits abandonment as an alternative ground for affirmance of the order denying suppression. This argument was neither presented to nor ruled upon by the district court. Nevertheless, even viewing the evidence, *i.e.*, Officer Crooke's testimony, in the light most favorable to the government, we hold that Wilson's actions immediately prior to his arrest did not amount to an abandonment such as would purge the taint from the police conduct.

Unlike the situation in *Hodari D.*, the purported abandonment of the coat by Wilson occurred *after* he had been illegally seized. Wilson's action was clearly the direct result of the illegal seizure, and it follows that the recovered drugs were the fruit of the illegality and must be suppressed. *United States v. Beck*, 602 F.2d 726 (5th Cir.1979).

Deterrence of police misconduct, one of the reasons for the exclusionary rule, is well-served by this ruling. In an airport setting, where passengers and others are coming and going at a rapid pace, the temptation to manufacture justification for prolonged investigative stops increases. The rule for which the government argues, however, might well promote provocative confrontations with suspects, in the hopes of inducing flight and, with luck, the abandonment of contraband.

### V.

For the foregoing reasons, we reverse the order denying Wilson's motion to suppress, vacate the judgment of conviction, and remand for further proceedings.

VACATED AND REMANDED.