82 F.3d 423
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Suzen ROSSINI, surviving spouse of Bernard G. Rossini,
deceased, etc.; Petrina Blackmer, surviving spouse of Joel
Blackmer, deceased, etc.; Cathie Hederman, surviving spouse
of Francis Anthony Hederman, deceased, etc. et al.,
Plaintiffs-Appellants,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 94-17124.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 11, 1996.
Decided April 9, 1996.
 
 1
 Before: HALL and BRUNETTI, Circuit Judges and WEINER, District Judge.*
 
 
 2
 MEMORANDUM**
 
 
 3
 Appellants, the surviving family members of a group of airmen who were shot down while flying a humanitarian mission to Morocco, challenge the district court's order dismissing their claim for lack of subject matter jurisdiction under the foreign country exception of the Federal Torts Claim Act ("FTCA"). 28 U.S.C. § 1346(b), § 2860(k). We affirm.
 
 
 4
 Under the FTCA, the federal government may be sued for injuries "caused by the negligent or wrongful act or omission of any employee of the Government." 28 U.S.C. § 1346(b). However, pursuant to the foreign country exception, the United States accepts no liability for claims "arising in a foreign country." 28 U.S.C. § 2680(k). A tort claim "arises" in the place where the negligent act or omission occurs, not necessarily at the site of the injury or the place where the negligence has its "operative effect." Cominotto v. United States, 802 F.2d 1127, 1129-30 (9th Cir.1986).
 
 
 5
 Appellants argue that their claim does not fall under the foreign country exception because it is a "headquarters claim." A valid " 'headquarters claim' exists where negligent acts in the United States proximately cause harm in a foreign country." Id. at 1130.
 
 A.
 
 6
 First, appellants contend that it was reasonably foreseeable that the planes would be redeployed from Senegal to Morocco. As evidence, appellants rely primarily on telefaxes exchanged prior to finalizing the Senegal contract. These faxes mention the possibility of redeployment to other areas in Africa. Appellants also note that U.S. AID had a current contract with T & G Aviation for spraying missions in Morocco; therefore, it was reasonably foreseeable that the planes assigned to the Senegal mission might be redeployed to Morocco and would be flying over the Western Sahara from Senegal.
 
 
 7
 However, reviewing the trial record in its entirety, there is adequate support for the district court's finding that the redeployment was not reasonably foreseeable. First, the actual contract did not incorporate any terms regarding redeployment. Second, T & G Aviation President Woody Grantham testified that he first began discussing redeployment "only a week" before the shootdown and that he made the final decision "two or three days" before the planes left Senegal.
 
 
 8
 Third, the record reflects that these discussions concerning redeployment took place in Morocco, not the United States thus undermining appellants' contention that before the planes left Arizona it was foreseeable that they would be redeployed to Morocco. Fourth and finally, at trial T & G employees testified that they learned of the move to Morocco only days before they were to leave for Agadir.
 
 
 9
 Given the trial record, "the district court's account of the evidence is plausible." Services Employees Int'l Union v. Fair Political Practices, 955 F.2d 1312, 1317 n. 7 (9th Cir.), cert. denied, 112 S.Ct. 3056 (1992). Although there was evidence to the contrary regarding foreseeability, this court must accept the trial court's finding of fact even if it would have reached a different result. Id. Accordingly, we find that the trial court did not commit clear error in finding that redeployment was not foreseeable at the time the contract was being negotiated.
 
 B.
 
 10
 Appellants also argue that, upon learning that T & G Aviation intended to fly from Senegal to Morocco, government officials in the United States breached their continuing duty to warn T & G Aviation of the dangers attendant to flying over the Western Sahara. As appellants concede, whether an employer with knowledge of the peculiar risks unknown to an independent contractor owes a duty to the independent contractor and its employees is an open question in the District of Columbia.[1] The district court found that no official in the United States knew or should have known that T & G was planning to send its planes to Morocco.
 
 
 11
 We need not determine whether the district court's factual finding was clearly erroneous. Nor need we determine whether appellants' claim would be viable under the law of the District of Columbia. As explained in Part C, even if appellants' continuing duty theory could state a viable "headquarters claim," their own contributory negligence would bar relief under District of Columbia law.
 
 C.
 
 12
 Third and finally, appellants argue that the district court erred in finding that the crew members' own negligence contributed to their deaths.[2] We find that the court's factual finding is amply supported by the record and is therefore not clearly erroneous.
 
 
 13
 First, the court correctly observed that federal regulations require that before making an international flight, all pilots should consult two Federal Aviation Administration ("FAA") publications: the International Flight Information Manual ("IFIM"), which is a pre-flight and planning guide for use by American business and private aviators, and the International Notices to Airmen ("INOTAMs"), a bi-weekly publication which publishes warnings about trouble spots in the air.
 
 
 14
 Both these publications contained warnings regarding flights to Morocco. The April 1988 IFIM stated that "[i]n early 1985, two private aircraft which failed to comply with Moroccan Civil Aviation directions were destroyed by Polisario missiles in the disputed Western Sahara region."[3] The INOTAM had the following warning:
 
 
 15
 With immediate effect and until further notice, because of incidents in the Western Sahara region on January 21 and February 21, 1985, resulting in aircraft downing which were most likely caused by surface to air missile firings, it is strongly recommended that flights maintain a minimum altitude of 20,000 feet in that area of the Canarys Flight Information Region (FIR) over the land mass of the Western Sahara south of 26 degrees north latitude and for a distance of five nautical miles out to sea parallel to the Sahara coast.... Recommend all descents be made from seaward and climbs seaward until passing 20,000 feet or until passing more than five [nautical miles] from the coast.
 
 
 16
 Pilot Joseph Loughran testified that he did not review these bulletins because they were not readily available at the Senegalese flight station where the crews filed their flight plans. From this fact, the district court inferred that the pilot of the lead plane, Ben Rossini, also did not consult the IFIM, INOTAM or the Airmen's Manual: "The court believes that if the pilots in the lead plane had adequately informed themselves of conditions in the region, that they would have shared the information regarding the regional hostilities with the pilots in the rear plane."
 
 
 17
 We find that this is a plausible inference. Furthermore, we note that all of the relevant bulletins were available to the crew at the FAA office at the U.S. embassy in Dakar, from the U.S. military attache in Dakar, and by radio from any flight service station. Had the crew members followed normal procedure and obtained this information, they would have been warned of the potential danger posed by the Polisario.[4]
 
 
 18
 Besides failing to apprise themselves of relevant information, the pilots also flew at an unsafe altitude. It is undisputed that both planes flew at an altitude of 11,000 feet, well below the 19,000 feet listed in the flight plan that was filed by crew members. The government's expert witness, Bernard Coogan, explained that flying at a lower altitude posed inherent risks because it exposed the planes to "ground fire, which could be lethal at that type of altitude." He further noted that the entire Western Sahara region "whether it happened to be within the confines of the NOTAM or to the east of it, or along the coast, is all a bad area to be flying over at low altitude."[5]
 
 
 19
 Loughran testified that although the filed flight plan stated that the aircraft would be flying at 19,000 feet, he and Rossini were flying at an altitude of 11,000 feet because their planes were not pressurized and not equipped with supplemental oxygen. However, he also admitted that the planes could have flown at a higher altitude if equipped with supplemental oxygen tanks. For reasons that were never clearly stated, these precautions were not observed by either flight crew.[6]
 
 
 20
 The record developed at trial amply supported the district court's conclusion that the crew's negligence contributed to this accident. Under District of Columbia law, contributory negligence is an absolute bar to recovery, Wainwright v. Wash. Metro. Area Transit Authority, 903 F.Supp. 133, 136 (D.D.C.1995). Therefore, appellants' claim of negligence cannot stand.
 
 CONCLUSION
 
 21
 Because the district court's findings of fact were not clearly erroneous, we AFFIRM.
 
 
 
 *
 Hon. Charles R. Weiner, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 As a preliminary matter, we find that District of Columbia law, not Arizona law, applies to this lawsuit. The FTCA ordains that the "law of the place" where the act or omission occurred shall govern actions for damages against the United States. 28 U.S.C. § 1346(b). The Act's "reference to the 'law of the place' encompasses choice-of-law principles." Rodriguez v. United States, 54 F.3d 41, 44 (1st Cir.1995); see also Smith v. United States, 953 F.2d 116, 1119 (9th Cir.1991) (discussing FTCA's choice-of-law language in context of whether Antartica is foreign country within meaning of FTCA)
 Two reasons militate in favor of applying D.C. law: First, in ruling on the government's motion for summary judgment and appellants' cross-motion for summary judgment, the district court determined that the law of District of Columbia controlled. Second, the alleged failure to warn occurred in Washington D.C. where U.S. AID is based.
 
 
 [2]
 The court also determined that the accident was caused by "the hostile act of a known military force," namely the Polisario
 
 
 [3]
 In 1985, Polisario guerillas shot down two French aircraft flying over the Western Sahara
 
 
 [4]
 Although appellants attempt to minimize the importance of the IFIMs and INOTAMs, the government's expert witness testified that when flying in Africa, a reasonably prudent pilot would refer to these documents because they provide "critical" information regarding dangers and hostilities
 
 
 [5]
 Coogan's observation undercuts appellants' argument that even if the crew members had consulted the bulletins such a precaution would not have saved their lives because the men were shot down north of the 26th parallel--an area for which the bulletins gave no specific warning. As Coogan observed, any overland route over the Western Sahara was potentially dangerous when flying at a low altitude
 
 
 [6]
 Judge Conti also determined that if they had prepared properly, the pilots might have opted for a safer route. For example, the planes could have taken a flight path over the water out towards the Canary Islands, thereby skirting the Western Sahara altogether. Loughran testified that this particular route would have added only "twelve or fourteen minutes" to the Dakar-Agadir flight