COURT OF APPEALS OF VIRGINIA


Present:   Judges Elder, Clements and Haley
Argued by teleconference


COMMONWEALTH OF VIRGINIA
                                                    MEMORANDUM OPINION* BY
v.        Record No. 1081-05-4              JUDGE JEAN HARRISON CLEMENTS
                                                         OCTOBER 25, 2005
HOWARD LAMONT JACKSON


                FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                            Stanley P. Klein, Judge

            Donald E. Jeffrey, III, Assistant Attorney General (Judith
            Williams Jagdmann, Attorney General, on brief), for appellant.

            Robert C. Whitestone (Whitestone, Brent, Young & Merril, P.C.,
            on brief), for appellee.


        Howard Lamont Jackson stands indicted for possession of cocaine with the intent to

distribute, in violation of Code § 18.2-248.  Pursuant to Code § 19.2-398, the Commonwealth

appeals the pretrial ruling of the trial court granting Jackson's motion to suppress evidence of the

cocaine found in his car by the police.  The Commonwealth contends the trial court erred in

suppressing the evidence because the cocaine was obtained as a result of an encounter that was

entirely consensual until Jackson's arrest after the cocaine was discovered.  Concluding that the

encounter between Jackson and the police was not consensual and, instead, constituted a seizure

within the contemplation of the Fourth Amendment, we affirm the judgment of the trial court.

        As the parties are fully conversant with the record in this case, and because this

memorandum opinion carries no precedential value, this opinion recites only those facts and

_____
        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

incidents of the proceedings as are necessary to the parties' understanding of the disposition of this appeal.

## I. BACKGROUND

"On appeal, we apply a *de novo* standard of review in determining whether a person has been seized in violation of the Fourth Amendment." Harris v. Commonwealth, 266 Va. 28, 32, 581 S.E.2d 206, 209 (2003). However, "we are bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them[,] and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." McGee v. Commonwealth, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (en banc) (citing Ornelas v. United States, 517 U.S. 690 (1996)). Moreover, we view the evidence in the light most favorable to the party prevailing below, here Jackson, and afford that party all reasonable inferences fairly deducible therefrom. Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991).

So considered, the evidence presented at the hearing on Jackson's motion to suppress established that, on February 12, 2004, at approximately 11:30 p.m., a team of twelve Fairfax County police officers was conducting an arrest operation at the rear of a 7-Eleven convenience store. The officers were all dressed in black clothing for "officer safety." Some of the officers had masks on.

One of the officers, Lieutenant Carson, observed three men, unrelated to the operation, "engaging in conversation" at the rear of an open Exxon gas station located across the street from the 7-Eleven. Upon noticing the officers, one of the men got into a gray car and the other two men, one of whom was Jackson, ran behind the Exxon station. Finding it suspicious that the men would "run at the sight of the police," Lieutenant Carson decided to investigate. He and Detectives Carroll and Hellwig got into an unmarked police vehicle and went to look for the two men. Each officer

carried a holstered service revolver and wore a black vest emblazoned with the word "Police" in white lettering across the front and a police badge clipped to it. None of the three officers had masks over their faces.

The officers located Jackson and his companion walking "quickly" along a sidewalk not far from the Exxon station. When Jackson and his companion entered the parking lot of another gas station, the officers pulled into the parking lot six feet behind them. The vehicle's flashing lights were not activated. The gas station was closed, and the only light in the parking lot came from the station's lobby and the headlights of the police vehicle.

Immediately upon entering the parking lot, the officers exited their vehicle. Detective Carroll approached Jackson and asked him, "Can I talk to you for a minute?" Jackson, who recognized that the men were police officers, answered in the affirmative. Detective Hellwig asked Jackson's companion to "step to the side with him" about fifteen feet away from Jackson's location. After listening to the beginning of Carroll's conversation with Jackson, Lieutenant Carson "walked away" and observed the encounter from a distance.

Detective Carroll first asked Jackson where he was coming from and where he was going. Jackson responded that he "was coming from Route 1" and "was walking to D.C." Carroll said that Jackson was "bullshitting." Carroll then asked Jackson if he had been at the Exxon station across from the 7-Eleven. When Jackson answered "no," Carroll told Jackson that he did not believe him and stated, "We saw you running to the rear of the Exxon station, were you at the Exxon station?" Jackson eventually told the officer that he "was only running to the rear of the station to urinate." Jackson also eventually told the officer he had arrived at the Exxon station in a "gray car."

Detective Carroll then asked Jackson if he had "any drugs or money" on him, and Jackson responded that he did not. When Carroll asked if he could search him, Jackson responded affirmatively. In conducting the search, Detective Carroll placed his hand on Jackson's chest and

felt a "rapid pulse," which, Carroll reasoned, confirmed that Jackson was one of the people the officers had seen running earlier. Detective Carroll then retrieved a "large quantity of money" and a set of keys from Jackson's pockets. In response to the officer's inquiry, Jackson explained he was carrying the cash because "he was going to buy a car." Carroll counted the money and returned it to Jackson. Carroll placed the keys on the hood of the police vehicle. At no point did Carroll or any of the other officers tell Jackson he was free to leave.

Approximately six minutes into the encounter, one of the other officers whispered to Detective Carroll that Jackson's companion had said they had come to the area in Jackson's "red Toyota," which was parked nearby. When Carroll questioned Jackson about the red Toyota, Jackson admitted he had arrived in it. In response to the officer's inquiry, Jackson denied that there was anything illegal in the vehicle. Carroll then asked Jackson for permission to search the red Toyota, and Jackson said he could.

Using Jackson's keys, Lieutenant Carson and Detective Hellwig searched the red Toyota. In a compartment on the driver's side door, they discovered a paper bag containing two lighters and "what appeared to be a rock of crack cocaine." The officers then placed Jackson under arrest.

Conceding at the suppression hearing that the police officers did not have sufficient information to warrant an investigatory stop pursuant to Terry v. Ohio, 392 U.S. 1 (1968), the Commonwealth argued that the encounter with Jackson was entirely consensual. Relying on that concession and finding Jackson was seized prior to consenting to the search of his car, the trial court granted Jackson's motion to suppress.

This appeal followed.

## II. ANALYSIS

The Commonwealth contends that "[n]one of the circumstances surrounding the officers'

encounter with [Jackson], taken individually or collectively, support the trial judge's finding that

[Jackson] was seized prior to giving consent to search his vehicle." Rather, the Commonwealth

argues, the encounter between Jackson and the police was entirely consensual until Jackson's arrest.

Thus, the Commonwealth concludes, the trial court erred in finding Jackson was seized for Fourth

Amendment purposes. We disagree.

Fourth Amendment jurisprudence recognizes three categories of citizen-police encounters.

Sykes v. Commonwealth, 37 Va. App. 262, 267, 556 S.E.2d 794, 796 (2001).

> First, there are consensual encounters which do not implicate the
> Fourth Amendment. Next, there are brief investigatory stops,
> commonly referred to as "Terry" stops, which must be based upon
> reasonable, articulable suspicion that criminal activity is or may be
> afoot. Finally, there are "highly intrusive, full scale arrests" or
> searches which must be based upon probable cause to believe that a
> crime has been committed by the suspect.

McGee v. Commonwealth, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (citations omitted).

Because the Commonwealth conceded at the suppression hearing that reasonable suspicion did not

exist to warrant a Terry stop, the only issue before us here is whether the encounter between

Jackson and the police was consensual.[1]

"Police officers do not violate the Fourth Amendment . . . when the person's encounter with

the police is consensual." Harris, 266 Va. at 32, 581 S.E.2d at 209.

> A consensual encounter occurs when police officers approach
> persons in public places "'to ask them questions,'" provided "'a
> reasonable person would understand that he or she could refuse to
> cooperate.'" United States v. Wilson, 953 F.2d 116, 121 (4th Cir.

---

[1] It necessarily follows from the Commonwealth's concession that sufficient information to warrant an arrest was lacking as well. "Reasonable suspicion is a less demanding standard than probable cause . . . ." Alabama v. White, 496 U.S. 325, 330 (1990); see also Clarke v. Commonwealth, 32 Va. App. 286, 295, 527 S.E.2d 484, 488 (2000) ("The test for reasonable suspicion under Terry is less stringent than the test for probable cause.").

1991) (quoting Florida v. Bostick, 501 U.S. 429, 431 (1991)); see also Richards v. Commonwealth, 8 Va. App. 612, 615, 383 S.E.2d 268, 270 (1989). Such encounters "need not be predicated on any suspicion of the person's involvement in wrongdoing," and remain consensual "as long as the citizen voluntarily cooperates with the police." Wilson, 953 F.2d at 121.

Payne v. Commonwealth, 14 Va. App. 86, 88, 414 S.E.2d 869, 870 (1992).

"If, however, a reasonable person would not feel free to decline an officer's requests or would not feel free to leave, the encounter is not consensual and constitutes an illegal seizure under the Fourth Amendment." Harris, 266 Va. at 32, 581 S.E.2d at 209 (citing United States v. Mendenhall, 446 U.S. 544, 558-59 (1980)). Thus, a consensual encounter loses its consensual nature and becomes a seizure for Fourth Amendment purposes when a reasonable person would believe that he or she is no longer free to walk away from the police, disregard their questions, ignore or decline their requests, or otherwise end the encounter with them. See Piggott v. Commonwealth, 34 Va. App. 45, 49, 537 S.E.2d 618, 619 (2000); Payne, 14 Va. App. at 88-89, 414 S.E.2d at 870. Hence, when "a law enforcement officer, by physical force or some display of authority, restrains in some manner a citizen's freedom of movement," we may conclude that a "seizure" has occurred. McCain v. Commonwealth, 261 Va. 483, 490-91, 545 S.E.2d 541, 545 (2001).

> Various factors have been identified as relevant in determining whether a seizure has occurred, including the threatening presence of a number of police officers, the display of weapons by officers, physical contact between an officer and a citizen, an officer's language or tone of voice compelling compliance, the retention of documents requested by an officer, and whether a citizen was told that he or she was free to leave.

Harris, 266 Va. at 32, 581 S.E.2d at 209 (citing Ohio v. Robinette, 519 U.S. 33, 36 (1996); Florida v. Royer, 460 U.S. 491, 504 (1983); Mendenhall, 446 U.S. at 554). "The decision whether the encounter was consensual must be made based on the totality of the circumstances." Id.

Applying these principles to the circumstances of this case, we conclude that the encounter between Jackson and the police was not consensual.  Viewed in the light most favorable to Jackson, the evidence established that, after Jackson and his companion attempted to avoid contact at night with a group of darkly clothed police officers, some of whom were masked, three officers from that group pursued them in an unmarked police vehicle.  Upon reaching Jackson and his companion, the armed officers pulled in behind them and approached them in a poorly lit parking lot.  Although Jackson agreed to speak with Detective Carroll, none of the police officers, all of whom remained nearby throughout the encounter, informed Jackson that he need not cooperate and was free to leave.  Physically separated from his companion, Jackson was then questioned regarding his recent whereabouts.  After he responded, Carroll repeatedly accused him of lying.  When Jackson agreed to be searched, Carroll sought further manifestation of Jackson's untruthfulness by physically placing his hand on Jackson's chest to determine if Jackson had a raised pulse.  Carroll also obtained Jackson's money and car keys during the search.  Despite returning the money to Jackson, Carroll placed the keys atop the hood of the police vehicle and retained them for the duration of the encounter.  When combined with the other circumstances that preceded it during the encounter, the retention of the keys by the officer clearly constituted a show of authority that effectively removed Jackson's ability to leave and would make a reasonable person in Jackson's position believe he or she was not free to end the encounter and walk away from the police.

We hold, therefore, that the encounter between Jackson and the police was not consensual and, instead, constituted an illegal seizure.  Accordingly, we affirm the judgment of the trial court and remand for further proceedings should the Commonwealth be so advised.

Affirmed.