UNITED STATES of America,

v.

David CARTER, Appellant.

No. 91–3288.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 19, 1993.

Decided Feb. 23, 1993.

Ellen Barry, Asst. Federal Public Defender, with whom A.J. Kramer, Federal Public Defender, was on the brief, for appellant.

Nancy E. Smith, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher, and Roy W. McLeese, III, Asst. U.S. Attys., were on the brief, for appellee.

Before WALD, RUTH BADER GINSBURG, and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

Dissenting opinion filed by Circuit Judge WALD.

D.H. GINSBURG, Circuit Judge:

David Michael Carter was indicted on one count of possession with intent to distribute 50 or more grams of a mixture and

substance containing cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(iii). Following an evidentiary hearing the district court denied Carter's motion to suppress evidence. Carter, who was later convicted and sentenced to ten years' imprisonment, appeals the denial of his motion to suppress evidence. We affirm the ruling of the district court.

## I. BACKGROUND

Two plain-clothes detectives from the Narcotics Interdiction Unit of the Metropolitan Police Department boarded an Amtrak train during its brief stopover at Union Station. Detective William Buss noticed one passenger, *viz.* the appellant, "squirming" in his seat, turning to look out the train window and turning back to look down the aisle as the officers approached. Detective Buss approached Carter, showed his police identification folder, and asked him about his trip. Carter replied that he was travelling from New York City to Fredricksburg, Virginia to look for construction work. Detective Buss then asked to see his ticket, which Carter handed to him. The ticket was for a passenger named "C. Carter." Detective Buss asked to see Carter's driver's license, which gave his name as "Michael Carter." Carter was acting nervously throughout this transaction; indeed, when Detective Buss handed the license back to him, Carter's hands were trembling so much that he dropped it.

Detective Buss then asked Carter if he was carrying any drugs and Carter said "No." Detective Buss asked Carter for permission to look in his tote bag and Carter said "Okay." When Detective Buss searched the bag he found an assortment of new construction tools. In response to a question, however, Carter stated that he had been working in construction all his life. Detective Buss, who has done a lot of construction work himself, thought that the tools were probably a mere prop because Carter was not carrying goggles or a hard hat and because he was carrying a level that would not be used in construction work. Detective Buss also believed that Carter "didn't have enough clothing to substantiate a trip of undetermined duration."

As the detective rifled through the tote bag, Carter indicated that he himself would go through the bag and pull out items to show the detective. He tried at least twice to put his hands into the bag, causing Detective Buss to ask, "Do you mind if I do the searching?" Detective Buss then removed from Carter's tote bag a brown paper bag, which Carter snatched back from him saying, "There's food in there; I will show you." At that point, Carter put his hand inside the paper bag, felt around, and finally withdrew his hand—which was empty. He then rolled up the paper bag and stood looking at Detective Buss. The detective stated, "I take it you don't want me to search that?" and Carter replied, "That's right."

Detective Buss told Carter that he was going to take the paper bag to a dog trained to detect narcotics by smell. Although Carter himself was not detained, he followed Detective Buss off the train and onto the platform. Detective Buss took the bag to a different section of the terminal.

While Detective Buss was gone, another officer approached and asked Carter if he had been carrying drugs in the paper bag. Carter admitted that he had been carrying drugs but added that they were not his. The officer then placed Carter under arrest. Moments later, Detective Buss returned and informed the other officers on the platform that the dog's reaction to the bag was positive and that he had opened the bag and found seventy-nine ziplock bags of apparent crack cocaine.

At his trial, Carter moved under the fourth amendment to the Constitution to suppress the drug evidence and his admission. The district court denied the motion, holding that Carter had consented to the search of his tote bag and that Detective Buss had a reasonable suspicion upon which to detain the paper bag for the purpose of a canine sniff test.

## II. ANALYSIS

■ Carter presents two challenges to the district court's denial of his motion to

suppress. First, he argues that the district court erred in finding that he voluntarily consented to the search of his tote bag. "Because of the fact-bound nature of the inquiry [into voluntariness], we generally reverse a trial judge's finding only for clear error." *United States v. Lewis*, 921 F.2d 1294, 1301 (D.C.Cir.1990). Here Detective Buss testified that Carter said "Okay" when asked if he could search the tote bag. When, because Carter kept putting his hand into the bag, Detective Buss asked, "Do you mind if I do the searching?" Carter removed his hand and again said "Okay." On these facts, the district court did not err, much less clearly err, in finding that Carter had consented to the search. *See United States v. Joseph*, 892 F.2d 118, 122 (D.C.Cir.1989) (no reversible error in finding that by reaching into bag during search defendant neither rendered search involuntary nor withdrew consent thereto).

◼ Second, Carter maintains that Detective Buss's seizure of the paper bag for further investigation was not supported by a reasonable suspicion. *See United States v. Place*, 462 U.S. 696, 702, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983) (police must have reasonable suspicion in order temporarily to detain personal effects for purpose of conducting limited investigation, including sniff by dog). The question whether a police officer acted upon a reasonable suspicion requires that we consider "the totality of the circumstances—the whole picture," as he saw it. *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

◼ Viewing the totality of the circumstances here, we conclude that Detective Buss had a reasonable suspicion based upon (1) Carter's arrival from a "source" city (New York); (2) his claim to be looking for construction work though he lacked the proper clothing and equipment; (3) his nervous behavior; and (4) his offer to show the food in the paper bag, followed by his removing his empty hand from the bag.

◼ Carter asserts that the district court impermissibly considered his withdrawal of consent in finding reasonable suspicion. We agree. The constitutional right to withdraw one's consent to a search, *see, e.g., Mason v. Pulliam*, 557 F.2d 426, 428–29 (5th Cir.1977), would be of little value if the very fact of choosing to exercise that right could serve as any part of the basis for finding the reasonable suspicion that makes consent unnecessary. *Cf. Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) (defendant's presence in drug-ridden area and refusal to identify himself to police does not give rise to reasonable suspicion of criminal activity); *United States v. Wilson*, 953 F.2d 116, 125–26 (4th Cir.1991) (refusal to allow search of coat, after consenting to search of luggage and person, should not have counted as a factor in "reasonable suspicion" analysis). But this insight is immaterial here. For (as the district court also observed) after Carter snatched the bag back from Detective Buss and thus withdrew his consent, he volunteered to show the detective the food he had claimed was in the paper bag. Carter then felt inside the bag, pulled his hand out with nothing in it, rolled up the paper bag, and stood there silently looking at Detective Buss. The detective could reasonably take this conduct into account, as part of the totality of the circumstances, regardless whether it occurred before or, as here, after Carter had given and then withdrawn his consent to a search. *See United States v. Jones*, 973 F.2d 928, 931 (D.C.Cir.1992) ("A suspect is 'free to leave' a non-seizure interview, but when he does so by abruptly bolting after having consented, the officers are free to draw the natural conclusions"). And when added to the other factors enumerated above, Carter's offer to show the detective the contents of his bag and his peculiar way of retracting that offer gave rise to a reasonable suspicion that he was concealing drugs in his bag, *i.e.*, quite apart from his earlier withdrawal of consent to a police officer's search.*

---

* Contrary to our dissenting colleague's characterization, we are not "allow[ing] the police to base

the necessary 'reasonable suspicion' for a luggage detention on *the manner* in which a person

### III. Conclusion

For the foregoing reasons, the temporary detention of the paper bag for a canine sniff did not violate Carter's rights under the fourth amendment. The judgment of the district court is therefore

*Affirmed.*

WALD, Circuit Judge, dissenting:

Law enforcement authorities have increasingly resorted to "consensual" encounters with citizens travelling on public transportation to ferret out drug couriers. At the trial of this case, Detective William Buss testified that during his four years as a member of the Narcotics Interdiction Unit of the Metropolitan Police Department he had approached over 500 persons at Union Station who he suspected of carrying drugs, and of that number, only three had refused to speak with him. It is of course well accepted that "the Fourth Amendment permits police officers to approach individuals at random in airport lobbies and other public places to ask them questions and to request consent to search their luggage, so long as a reasonable person would understand that he or she could refuse to cooperate." *Florida v. Bostick,* — U.S. —, —, 111 S.Ct. 2382, 2384, 115 L.Ed.2d 389 (1991). However, it is equally well accepted that a person so approached may exercise his unequivocal right "to disregard the police and go about his business." *California v. Hodari D.,* — U.S. —, —, 111 S.Ct. 1547, 1552, 113 L.Ed.2d 690 (1991). Only if the police have "reasonable, articulable suspicion, premised on objective facts, that the luggage contains contraband or evidence of a crime," *United States v. Place,* 462 U.S. 696, 702, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), may they seize the person's luggage for purposes of conducting a limited investigation, such as the canine sniff that occurred here.

My colleagues admirably recognize that "[t]he constitutional right to withdraw one's consent to a search ... would be of little value if the very fact of choosing to exercise that right could serve as any part of the basis for finding the reasonable suspicion that makes consent unnecessary." Majority opinion ("Maj. op.") at 1097. However, in the next breath, they allow the police to base the necessary "reasonable suspicion" for a luggage detention on *the manner* in which a person withdraws his consent. In my view that is cutting the Fourth Amendment right of a citizen to resist an otherwise unlawful search too fine. In order to preserve the Fourth Amendment as an effective safeguard against "police conduct which is overbearing or harassing," *Terry v. Ohio,* 392 U.S. 1, 15, 88 S.Ct. 1868, 1876, 20 L.Ed.2d 889 (1968), the courts must give full credit to a citizen's right to decline a police officer's entreaties to search his personal belongings when there is no probable cause or even reasonable suspicion for the search. Today's decision permitting the police to base an investigative seizure on the way in which a person withdraws (or presumably initially declines) consent to a police search takes too big a bite for me out of a fast eroding Fourth Amendment.

At oral argument, the government conceded that although Carter had arrived from a "source" city, carried what appeared (to Detective Buss at least) to be inappropriate equipment and clothing for the construction work he said he was seeking, and exhibited "nervous" behavior, these standard items in the typical drug courier profile were not, by themselves, sufficient to establish the reasonable, articulable suspicion required under *Terry,* 392

---

withdraws consent." Dissent Op. at 1098 (emphasis in original). Carter had withdrawn his consent when he retook the bag. His subsequent offer to show Detective Buss the food did not constitute a second consent, for he did not propose to allow the police officer to search the bag but instead indicated that he would himself show the officer the food he said it contained. For us to countenance the officer's reasonable suspicion based upon such post-withdrawal con-

duct in no way bears upon the extent to which a reasonable suspicion may be based upon "the manner" in which consent is withdrawn. *Cf. United States v. Wilson,* 953 F.2d 116, 126 (4th Cir.1991) ("We are not prepared ... to rule that the form of denial can *never* be included as a factor to be considered in determining whether an investigative stop was justified") (emphasis in original).

U.S. at 22, 88 S.Ct. at 1880, for even the limited seizure of Carter's tote bag necessary to conduct a canine sniff. *See, e.g., Reid v. Georgia,* 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) (defendant's arrival from source city insufficient foundation for reasonable suspicion); *United States v. Grant,* 920 F.2d 376, 386 (6th Cir.1990) (arrival from source city and nervousness insufficient). Rather, the government admitted that the critically decisive element in this case was the fact that in snatching the bag away from Detective Buss, Carter had simultaneously offered to show him its contents and then reneged on that offer by folding it up and keeping it firmly in his possession.[1] The majority similarly finds that it was this behavior that tipped the scale in favor of reasonable suspicion and allowed Detective Buss to snatch the bag back from Carter and take it away for the canine sniff. Maj. op. at 1097.

But it is well settled that even after consent to search is initially given, a person may subsequently limit or withdraw that consent. *See United States v. Springs,* 936 F.2d 1330, 1334 (D.C.Cir.1991); *United States v. Ward,* 576 F.2d 243, 244 (9th Cir.1978); *Mason v. Pulliam,* 557 F.2d 426, 428–29 (5th Cir.1977). Thus, I believe that my colleagues would agree that at the front-end of their "consensual" encounter, Carter could have offered to show Detective Buss the entire contents of the tote bag except for the brown paper bag, without raising reasonable suspicion. Similar-

ly, even after offering to reveal the contents of the brown paper bag, Carter was entitled to change his mind, and withdraw the offer. Indeed, that is precisely what Carter did by rolling up the bag and clutching it, provoking Detective Buss to ask the obvious "I take it that you don't want me to search that?" and Carter to respond "That's right."

We would all agree as well that Carter's withdrawal of his prior consent, as manifested by his snatching back of the brown paper bag and refusal to display its contents, could not by itself supply the reasonable suspicion necessary for an investigative seizure. *See United States v. White,* 890 F.2d 1413, 1417 n. 4 (8th Cir.1989), *cert. denied,* 498 U.S. 825, 111 S.Ct. 77, 112 L.Ed.2d 50 (1990); *see also Florida v. Royer,* 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion) (a person "may not be detained even momentarily without reasonable objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds"). However, under the majority's reasoning, it was the allegedly "peculiar way," Maj. op. at 1097, in which Carter reneged on his offer to reveal the contents of the bag that provided the basis for finding reasonable suspicion to seize the bag for inspection. While Carter was entitled to "just say no" to any further search of the bag, he had to do so in a way that would not raise the detective's suspicion that he had something to hide; not an easy feat under the circumstances. In my

1. My colleagues suggest that the crucially suspect offer to show what was in the bag and subsequent retraction of that offer was "post-withdrawal conduct [which] in no way bears upon the extent to which a reasonable suspicion may be based upon 'the manner' in which consent is withdrawn." Maj. op. at 1097–98 n. *. I believe a careful reading of the totality of the detective's testimony, set out below, belies any interpretation other than that the withdrawal of the offer to show the bag's contents was part and parcel of the main withdrawal of consent to search the bag itself:

I got to a point where I found a brown paper bag, and as I was pulling that brown paper bag from inside the tote bag, literally he snatched it from my hands, and he said, "There's food in there; I will show you," which is to me a legitimate reaction that he

wouldn't want a stranger to put his hands on somebody else's food.

However, he put his hand inside this paper bag, which I recall looked like the size of a candy bag, and he churned his hand inside—just moved his hand inside.

Now, if he had pulled out some type of food—a ham sandwich or some type of food, it would have showed legitimacy. But what he did; he just pulled his hand out of the bag, rolled up the paper bag and just stood there and looked at me.

And I said, "I take it you don't want me to search that?" and he said, "That's right."

At that point I told him I was going to have a narcotic dog sniff that bag.

I took the bag from him.

Transcript of May 13, 1991 Motions Hearing at 13 (testimony of Detective Buss).

view, such an approach effectively eviscerates the right to withdraw consent (certainly midway through a previously consented-to search) to nothing more than a pious throwaway sentence in judicial opinions approving searches. The reality is that so-called consensual encounters with the police are bound to be unnerving, and that most citizens—innocent or guilty—will feel the need to explain or excuse themselves when refusing to comply with a police request to search their luggage or anything contained therein,[2] and, in so doing, create the very suspicion that will be used to justify the previously unauthorized detention. In short, a person's refusal or withdrawal of consent to cooperate with the police can be inevitably expected to be accompanied by some nervous or even "suspicious" behavior. Permitting the police to rely on the atmospherics of the refusal or withdrawal of consent to supply the reasonable suspicion necessary to objectively justify an otherwise unlawful search or detention strips the legal right of withdrawal of all practical value. The citizen's Fourth Amendment right to refuse or withdraw consent to an otherwise unjustified search should not rest on so slender a distinction as the majority creates between a defendant's terse "No" and a refusal to consent couched in a "nervous" a/k/a "suspicious" manner.[3] If the right to withdraw consent for a "consensual" search is to have any meaning on the streets, as well as in the jurisprudence, it must encompass the manner as well as the fact of its exercise.

*United States v. Wilson*, 953 F.2d 116 (4th Cir.1991), also cited by the majority, is instructive in this regard. In that case, the defendant had (1) arrived from New York, a known source city; (2) looked back several times as he was leaving the airport and made eye contact with a government agent;

(3) claimed to be arriving from Boston; (4) failed to produce any identification but a check-cashing identification card; and (5) had a bulge in his coat. *Id.* at 120. The court found that "these facts alone d[id] not suffice to justify" a seizure, and "that the real reason for ... the seizure was Wilson's refusal to allow a search of his coat." *Id.* at 125–26. It continued:

> The government, however, avoids the obvious pitfall of positing the denial itself as a basis for suspicion and instead points to the particular wording of the reply.... As recounted by Officer Crooke: "I asked him if I may search his coats. And in an angry tone he replied back to me, no, you had your chance, and I wasn't permitted to search them." After some time, Wilson stated that "there were some things in there he didn't want us to see ... [,] some private things he didn't want us to see...." The government does not suggest what form of denial would not have contributed to the officer's suspicion.

*Id.* at 126. While the Fourth Circuit did indeed refuse to establish any per se rule that the way consent is denied can *never* be considered in the reasonable suspicion calculus, *see* Maj. op. at 1097–98 n. * (citing *Wilson*, 953 F.2d at 126), it also refused to permit the manner of declining consent to be the factor that "pushes the situation into the realm of 'reasonable suspicion.'" *Wilson*, 953 F.2d at 126. I agree with the Fourth Circuit that in all but the most extraordinary circumstances the police should have sufficient objective evidence for an investigative detention independent of the refusal or withdrawal of consent and the manner in which either is executed.

Police-citizen encounters pass constitutional muster only when they are truly

---

**2.** This is so because, as one notable commentator observes, "stonewalling would be perceived by the reasonable person (quite correctly) as a course which would make him an object of suspicion and thus a subject of further attention by the police team." 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 9.2A (2d ed. 1987 & Supp.1993).

**3.** It is not a sufficient yardstick that a reasonable person might have found Carter's retraction of his offer to show the contents of the bag to be suspicious. A reasonable person might

very well find *any* person's refusal to comply with a police officer's lawful request to search to be inherently suspicious and yet this refusal may not be used as the basis for investigative seizure. *See White*, 890 F.2d at 1417 n. 4. Thus, the issue here is not whether Carter's actions were in fact suspicious, but whether it is appropriate to consider these actions when they are an intrinsic part of the act of withdrawing consent.

consensual; that is, when the citizen "feel[s] free to decline the officers' requests or otherwise terminate the encounter." *Bostick,* —— U.S. at ——, 111 S.Ct. at 2387. If the police can disregard a person's attempt to decline a search request and seize that person's belongings simply because something about the way the person declined their request aroused their suspicion, the right to withdraw consent is fatally compromised and with it, the core notion of "consensual" police-citizen encounters. However urgent the police mission—and the avalanche of street arrests of drug couriers is now almost a decade old with little perceptible impact on the flow of drugs—the courts are "not empowered to suspend constitutional guarantees so that the Government may more effectively wage a 'war on drugs.' ... If that war is to be fought, those who fight it must respect the rights of individuals, whether or not those individuals are suspected of having committed a crime." *Bostick,* at ——, 111 S.Ct. at 2389. I think today's decision represents a step backward in drawing the "delicate balance" between the citizen's constitutional right to be left alone and safe streets.

I respectfully dissent.