**UNITED STATES of America**

v.

**Troy EDMONDS, Defendant.**

**No. 96–CR–0345.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Dec. 4, 1996.

shorts. Defendant's arrest promptly followed. The question presented, therefore, is whether under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the police officer had articulable, reasonable suspicion "that criminal activity [was] afoot" when he initially ordered defendant to raise his shirt.

## I

While patrolling on the evening of August 1, 1996, Officer Joseph T. Kantor, a uniformed member of the Arlington County Police Department ("ACPD"), observed two males in and around a red Toyota parked on a grassy strip behind a parking garage located at 1201 South Eades Street in Crystal City, Virginia. A four-year veteran of the ACPD, Officer Kantor had been monitoring this area, known as the "Eades Street Corridor," as part of a special patrol to quell a recent rise in automobile thefts. The Eades Street Corridor consists chiefly of federal government buildings and offices. When Office Kantor first noticed the two men at 10:30 p.m., the area was dark and essentially deserted.

As Officer Kantor approached the Toyota in his marked cruiser, he noticed that one of the men was sitting in the driver's seat, while the other was standing outside the vehicle, near the rear left hand side. The vehicle was parked in a well-marked no-parking/tow-away zone with its engine and lights turned off. The person outside the vehicle apparently became aware of Office Kantor's cruiser as it drew nearer. Officer Kantor observed this person stare at the cruiser and then begin to walk away from the Toyota toward the cruiser. That person, later identified as defendant, Troy Edmonds, carried a brown and black duffle bag over his left shoulder. Initially, Edmonds walked slowly, but his gait rapidly increased as soon as it became apparent that Officer Kantor was driving toward him. Believing that he had inadvertently stumbled upon an auto larceny or related crime in progress, Officer Kantor immediately stopped his cruiser, exited it, and confronted Edmonds. He positioned himself so as to maintain an unobstructed view of both Edmonds and the person inside the Toyota.

Helen F. Fahey, United States Attorney, John P. Rowley, III, Assistant United States Attorney, Alexandria, VA, for U.S.

Edwin A. Williams, Kellogg, Williams & Lyons, Vienna, VA, William J. Garber, Washington, DC, for Troy Edmonds.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this case, a consensual encounter between a police officer and defendant escalated to a stop, at which time defendant was not free to leave and the police officer, concerned that defendant's loosely-fitted T-shirt concealed a weapon, directed defendant to lift his shirt. When defendant refused, the police officer reached over and lifted defendant's shirt, thereby exposing a weapon tucked into the waistband of defendant's

At this point, Officer Kantor asked Edmonds, who was wearing shorts and a large, loose-fitting T-shirt, "what was going on?" Edmonds explained that his "buddy dropped [him] off." Officer Kantor next asked, "whose car," to which Edmonds responded, "my buddy's." Officer Kantor then requested that Edmonds produce some identification. While Edmonds put down the duffle bag and retrieved his identification from his back pocket, Office Kantor inquired whether Edmonds possessed any weapons or drugs. Edmonds replied no. Next, Officer Kantor directed Edmonds to lift up his shirt so that he could see his waistband. In response, Edmonds asked "why?"

Up to this time, Edmonds had fully cooperated. But Officer Kantor now noticed that Edmonds was visibly nervous and growing perceptibly more anxious. Again, he asked Edmonds to lift his shirt. Again Edmonds refused, asking instead "why do you need to see my waist?" With that response, Officer Kantor drew his weapon and reached over and lifted the right front corner of Edmonds' shirt. On doing so, he immediately observed the black grip handle of a semi-automatic pistol. Officer Kantor pointed his weapon at Edmonds, advised him not to move or he would be shot, and radioed for backup. At that point, Edmonds' companion exited the vehicle and began to run away. This person escaped because Officer Kantor understandably chose to focus his attention solely on Edmonds.

Officer Kantor next removed the weapon from Edmonds' waistband and observed that it was a fully-loaded Taurus 9mm semi-automatic with a round in the chamber. He then placed Edmonds under arrest for carrying a concealed weapon. Incident to the arrest and for inventory purposes, Officer Kantor searched the duffle bag. On opening the duffle bag, Officer Kantor found approximately 290 grams of crack cocaine, 503 grams of cocaine hydrochloride, $23,610 cash, and a Glock 10mm semi-automatic pistol. Subsequently, Edmonds was taken to the ACPD where he executed a written waiver of his constitutional rights. Following this, Edmonds admitted ownership of the bag and its contents and made other incriminating statements.

In September 1996, the grand jury returned a four count indictment against Edmonds for: (i) possession with intent to distribute crack cocaine; (ii) possession with intent to distribute cocaine hydrochloride; (iii) using and carrying a firearm in relation to a drug trafficking crime; and (iv) possession of a firearm by a convicted felon. On October 11, 1996, Edmonds filed a motion to suppress any and all evidence seized from his person, the duffle bag, and any statements obtained following his arrest. On October 25, the Court heard oral argument and denied Edmonds' motion for the reasons stated from the bench. *United States v. Edmonds,* C.A. No. 96–345–A (Order, October 25, 1996). This memorandum opinion further elaborates the reasons for this ruling.

## II

The parties dispute whether Officer Kantor had the requisite articulable, reasonable suspicion to detain Edmonds at the point at which their encounter ceased to be consensual—that is, when Officer Kantor initially asked Edmonds to raise his baggy shirt. The principles dispositive of this dispute are well-established.

As a general rule, a police-citizen encounter will not trigger the protections of the Fourth Amendment unless and until it ceases to be consensual. *Terry,* 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16; *Florida v. Rodriguez,* 469 U.S. 1, 5–6, 105 S.Ct. 308, 310–11, 83 L.Ed.2d 165 (1984); *Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991). Thus, it is well-established that "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983). As long as "a reasonable person would feel free 'to disregard the police and go about his business,'" the encounter re-

mains consensual and requires no reasonable suspicion. *Bostick*, 501 U.S. at 434, 111 S.Ct. at 2386 (quoting *California v. Hodari*, 499 U.S. 621, 625, 111 S.Ct. 1547, 1550, 113 L.Ed.2d 690 (1991)); *see also United States v. Flowers*, 912 F.2d 707, 712 (4th Cir.1990), *cert. denied*, 501 U.S. 1253, 111 S.Ct. 2895, 115 L.Ed.2d 1060 (1991). In other words, if a person is free to leave, then he or she has not been detained according to the Fourth Amendment. *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980); *United States v. Gordon*, 895 F.2d 932, 937 (4th Cir.), *cert. denied*, 498 U.S. 846, 111 S.Ct. 131, 112 L.Ed.2d 98 (1990).

■ Police-citizen encounters often progress from consensual encounters to stops, where a citizen is detained briefly for investigative purposes. But this may occur, consistent with the strictures of the Fourth Amendment, only if the police officer has reasonable suspicion, based on articulable facts, that criminal activity is afoot. *See Terry*, 392 U.S. at 29, 88 S.Ct. at 1884; *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989); *United States v. Crittendon*, 883 F.2d 326, 328 (4th Cir.1989). And during the brief stop, the officer may conduct a limited, protective search for weapons provided he has sufficient reason to believe that the detained individual is armed and dangerous. *See Terry*, 392 U.S. at 30, 88 S.Ct. at 1884; *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972). But a "stop and frisk," as such an event is commonly called, must not be based on subjective hunches, because the Fourth Amendment demands "some minimal level of objective justification to validate the detention or seizure." *INS v. Delgado*, 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984); *see also Terry*, 392 U.S. at 27, 88 S.Ct. at 1883; *Adams*, 407 U.S. at 146, 92 S.Ct. at 1923; *Michigan v. Long*, 463 U.S. 1032, 1050, 103 S.Ct. 3469, 3481, 77 L.Ed.2d 1201 (1983). The quantum of articulable, reasonable suspicion required, however, is less than that required for probable cause. *Sokolow*, 490 U.S. at 7, 109 S.Ct. at 1585 (citing *United States v. Montoya de Hernandez*, 473 U.S. 531, 541, 105 S.Ct. 3304, 3310, 87 L.Ed.2d 381 (1985)). But courts

assessing the validity of a *Terry* "stop and frisk," like courts assessing probable cause, must consider "the totality of the circumstances." *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981). Thus, factors to be considered when determining whether a stop violated the Fourth Amendment include: an area's crime rate; the nature of the questionable activity observed; the time of day; any suspicious behavior of the suspect; and the practical experience of officers involved in the stop. *United States v. Lender*, 985 F.2d 151, 154 (4th Cir.1993).

These principles applied here compel the conclusion that Officer Kantor's stop and frisk of Edmonds was well within the bounds of the Fourth Amendment. Thus, Officer Kantor knew that the Eades Street Corridor was the site of a recent wave of automobile thefts and other related crimes; in fact, he drove into that area as part of a special ACPD patrol. Next, Officer Kantor first saw the Toyota parked, with its engine and lights turned off, in an no-parking/tow-away zone behind a parking garage at 10:30 p.m., a time of minimal activity in a chiefly commercial area. These facts alone would prompt a reasonable officer to suspect a possible car theft in progress. Indeed, this is precisely what Officer Kantor suspected. Events that followed only fueled this suspicion. As Officer Kantor drove toward the Toyota, he noticed that Edmonds began to walk away from the vehicle and that his gait increased as the police cruiser drew closer. Officer Kantor also observed that Edmonds carried a large duffel bag of the kind typically used, in his experience, by automobile thieves to conceal their tools. The totality of these facts and circumstances plainly give rise to articulable, reasonable suspicion that some sort of criminal activity was afoot. Accordingly, Officer Kantor's stop of defendant fell squarely within *Terry* and its progeny.

■ Edmonds contends that even if the brief stop was permissible, the subsequent search or frisk of his person was not. According to Edmonds, Officer Kantor's request that he lift his shirt and the officer's subsequent lifting of the shirt were so intru-

sive that his actions amounted to an arrest without probable cause. This position is meritless. *Terry* and its progeny do not limit a weapons search incident to a stop to a pat-down or frisk. To the contrary, the Fourth Amendment permits non-intrusive, reasonable means other than a frisk where, as here, the other means are necessary in the circumstances to ensure that the suspect is not armed. This proposition is supported by settled authority involving facts strikingly similar to those at bar. For example, in *United States v. Baker*, 78 F.3d 135 (4th Cir.1996), a police officer's request to raise the suspect's shirt to check for a concealed weapon was held "less intrusive than the pat-down frisk sanctioned in *Terry*." *Id.* at 138. Similarly, the Ninth Circuit, in *United States v. Hill*, 545 F.2d 1191 (9th Cir.1976), found that a police officer's lifting of defendant's shirt "did not transcend the permissible bounds established by *Terry*." *Id.* at 1193. Nor is it significant in this regard that Officer Kantor did not detect a bulge in Edmonds' loose-fitting clothing. Courts recognize that a variety of common clothing can conceal a weapon without a tell-tale bulge. *See United States v. Douglas*, 964 F.2d 738, 740 (8th Cir.1992) (holding that the officer acted reasonably given that the suspect "was wearing a long coat which could have concealed a weapon."); *United States v. Buchannon*, 878 F.2d 1065, 1067 (8th Cir.1989) (finding that the officer "was justified in 'patting down' Buchannon ... [because] appellant was a larger man, wearing a long winter coat which might have concealed a weapon"). Accordingly, Officer Kantor's request to Edmonds that Edmonds lift his shirt followed by Officer Kantor's lifting of the shirt when Edmonds refused were a reasonable "frisk" incident to a *Terry* stop. The search was a limited and reasonable intrusion under the circumstances.

◼ Although this analysis is fully dispositive of Edmonds' motion to suppress, an al-ternative government argument merits attention. Specifically, the government contends that Edmonds' refusal to comply with Officer Kantor's request furnished part of the basis for the reasonable suspicion that justified the subsequent nonconsensual search of Edmonds. This contention is untenable; it does violence to the notion of a consensual or voluntary police-citizen encounter. To say, as the government does, that Edmonds was free to leave when Officer Kantor directed him to hoist his shirt, but not free to leave once he refused to comply, is to create a Catch–22 situation for a citizen. Thus, if a citizen's refusal to accede to a search in a consensual encounter can be the basis for converting the encounter into a stop and frisk situation, then the citizen really has no choice with respect to the search request. Assuming the government's argument is accepted, a police officer would be entitled to frisk a citizen regardless whether he refuses or consents to a search request. So in these circumstances, the voluntariness of the consensual encounter would be illusory, a result squarely at odds with any meaningful notion of such an encounter.[1] Further, permitting a police officer to use a person's refusal to consent as part of the basis for a *Terry* stop would unduly enlarge police discretion. Merely by approaching people on the street, police officers who lack the necessary suspicion to detain and search on the spot could then garner enough articulable facts through persistent, if not harassing, questioning and requests. The Fourth Amendment does not condone such police behavior.

For these reasons, the Supreme Court has repeatedly held that a person's refusal to consent to a police request during a noncoercive police encounter cannot, by itself, provide the basis for a *Terry* stop. *See, e.g., Bostick*, 501 U.S. at 437, 111 S.Ct. at 2387 ("[A]n individual may decline an officer's request without fearing prosecution. We have

**1.** As already noted, a citizen may refuse a police officer's consensual search request and is free to leave at any time. *See, e.g., Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991); *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). But, as the Supreme Court recently explained, a citizen need not be in-formed of the right to refuse and terminate the consensual encounter. *Ohio v. Robinette*, —— U.S. ——, 117 S.Ct. 417, —— L.Ed.2d —— (1996) (finding that it would "be unrealistic to require police officers to always inform detainees that they are free to go before a consent to search may be deemed voluntary.").

consistently held that refusal to cooperate, without more, does not furnish the minimum level of objective justification needed for a detention or seizure."); *Royer*, 460 U.S. at 498, 103 S.Ct. at 1324 (holding that a person "may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds"). And while the Supreme Court has ruled that a citizen's refusal to consent to a search can never furnish the sole basis for a brief detention and investigation, it has not yet addressed the question whether a refusal can be part of the basis for a *Terry* stop, as the government suggests in this case. The Fourth Circuit, however, has already rejected that position in *United States v. Wilson*, 953 F.2d 116 (4th Cir.1991) (holding that defendant's refusal to consent to a police search cannot be a factor in creating the needed reasonable suspicion to detain).[2]

In sum, immediately prior to the time Officer Kantor asked Edmonds to lift his loosely-fitting T-shirt, existing objective facts provided the officer with reasonable, articulable suspicion that he had happened on a car theft. It follows, therefore, that Officer Kantor was authorized to stop and frisk Edmonds. And further, Officer Kantor's request to Edmonds that he lift his shirt, as well as Officer Kantor's subsequent lifting of the shirt, were both the functional equivalent of a permissible "frisk" under *Terry* and its progeny. Accordingly, the motion to suppress must be denied.

An appropriate Order has issued.

---

2. In *Wilson*, defendant, who had just arrived at the airport, consented to a law enforcement officer's request for a search of his person and luggage. But defendant refused to consent to the search of two coats in his possession. Eventually, defendant acquiesced to the officer's persistent requests for a search of the coats, which led to the discovery in one coat of a brown paper bag containing cocaine. The Fourth Circuit held that the officer's persistent requests to search the coats after defendant's repeated denials converted the encounter into a *Terry* stop and that defendant's refusal to consent did not justify "reasonable suspicion." Although the Fourth Circuit was unwilling "to rule that the form of a denial can never be included as a factor to be considered in determining whether an investigatory stop was justified," *Wilson*, 953 F.2d at 126, it nonetheless concluded that defendant's refusal to consent could not be considered for that purpose in the case there presented. The panel reasoned that "if, on evidence such as this, police were permitted to disregard a suspect's attempts to ignore further questioning and to persist until 'reasonable suspicion' was created or consent given, the Fourth Amendment would be greatly diminished in its intended role as the bulwark against 'overbearing or harassing' police conduct." *Id.*

Other courts have also addressed the question whether a person's refusal to consent can form a partial basis for an investigative stop or seizure. *See United States v. Carter*, 985 F.2d 1095, 1097 (D.C.Cir.1993) (noting in dicta that "the constitutional right to withdraw one's consent to a search would be of little value if the very fact of choosing to exercise that right could serve as any part of the basis for finding ... reasonable suspicion"); *United States v. White*, 890 F.2d 1413, 1417 n. 4 (8th Cir.1989) (finding that the police "cannot use [defendant's] refusal to consent to the search of his bags as support for the requisite reasonable, articulable suspicion"), *cert. denied*, 498 U.S. 825, 111 S.Ct. 77, 112 L.Ed.2d 50 (1990). For an informative discussion of the topic, see Comment, Rachel Karen Laser, *Unreasonable Suspicion: Relying on Refusals to Support Terry Stops*, 62 U.Chi.L.Rev. 1161 (1995).