**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                            No. 97-4077

TROY EDMONDS,
Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis, III, District Judge.
(CR-96-345)

Argued: April 9, 1998

Decided: May 29, 1998

Before WILKINSON, Chief Judge, MICHAEL, Circuit Judge, and
CHAMBERS, United States District Judge for the
Southern District of West Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Edwin Arnold Williams, KELLOGG, WILLIAMS &
LYONS, Vienna, Virginia, for Appellant. William Neil Hammer-
strom, Jr., Assistant United States Attorney, Alexandria, Virginia, for
Appellee. **ON BRIEF:** Helen F. Fahey, United States Attorney, Alex-
andria, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Troy Edmonds conditionally pled guilty to several federal narcotics and firearm offenses. On appeal, he raises two issues. He argues that the district court should have suppressed evidence obtained during and after an investigatory stop. He also challenges his classification under the Sentencing Guidelines as a career offender. Finding both of these contentions without merit, we affirm the judgment of the district court.

I.

On the night of August 1, 1996, Officer Joseph T. Kantor, a four and one-half year veteran of the Arlington County Police Department, was alone on patrol. He was working near an area known as the South Eades Street Corridor where several automobile thefts and larcenies recently had occurred. At approximately 10:30 p.m., Officer Kantor drove his marked patrol car toward the intersection of Army/Navy Drive and South 12th Street. There was no traffic and very little activity in the area, which contains primarily government buildings and offices.

As he approached the intersection, Officer Kantor saw two men in and around a dark-colored automobile parked on a grassy strip. The car was in an "alley type area" behind a parking garage for a South Eades Street apartment building. The area was generally dark, though lights from the garage and a nearby highway provided some ambient lighting. The car was parked in a no parking/tow away zone with its engine not running and its lights off. One individual sat inside the vehicle; a second stood to the left rear of it with a duffle bag slung over his shoulder. In Officer Kantor's experience, automobile thieves often keep tools such as slam hammers and dent pullers in duffle bags.

2

Believing that he had come across an auto larceny or auto crime in progress, Officer Kantor began to approach the scene in his cruiser. As he did so, the individual standing in the alley, later identified as Edmonds, looked up from the dark-colored car. Edmonds looked to the left, looked to the right, then stared directly at Officer Kantor, never taking his eyes off of him. Edmonds began to walk away from the dark-colored car and toward Officer Kantor's cruiser. Edmonds initially walked slowly, but his gait soon became rapid. By the time Officer Kantor exited his cruiser, Edmonds was standing next to it. The other individual remained in the driver's seat of the dark-colored vehicle, approximately thirty yards away. Officer Kantor positioned himself so that he could speak to Edmonds but still observe the individual seated in the car.

Edmonds told Officer Kantor that his buddy, referring to the other individual, had just dropped him off. In light of the car's suspicious location, Officer Kantor did not believe him. Ample parking was available on 12th Street and in a guest parking lot at a nearby apartment building. To park on the grassy strip where the dark-colored automobile was located, one had to drive over a curb. Officer Kantor inquired who owned the car; Edmonds responded that it belonged to his buddy. Officer Kantor then requested to see Edmonds' identification. While Edmonds placed the duffle bag on the ground to retrieve his identification, Officer Kantor asked Edmonds whether he had any weapons or drugs on him. Edmonds replied that he did not.

Officer Kantor then directed Edmonds to pull up the large, baggy T-shirt covering the top of his waist. Officer Kantor made this request, rather than conduct a pat down search of Edmonds, so he could continue to observe the individual still seated in the dark-colored car. In response to Officer Kantor's request, Edmonds did not comply but immediately became anxious, shrugging his shoulders and shaking his head. Officer Kantor repeated his request; Edmonds continued to refuse. After Edmonds' third refusal, Officer Kantor drew his weapon, keeping it against the side of his leg, and lifted the right corner of Edmonds' shirt. He immediately saw the black handle of a semiautomatic weapon in Edmonds' waistband. As Officer Kantor was about to summon assistance, the other individual exited the dark-colored car and fled the scene. Officer Kantor removed a Taurus 9mm semiautomatic pistol from Edmonds' waistband and arrested him for

3

carrying a concealed weapon. A search of the duffle bag, incident to the arrest and for inventory purposes, revealed a loaded Glock 10mm semi-automatic pistol, several bags containing approximately 290 grams of cocaine base and 503 grams of cocaine hydrochloride, and $23,610 cash.

A grand jury charged Edmonds with two counts of possessing a controlled substance with an intent to distribute in violation of 21 U.S.C. § 841(a)(1), one count of using and carrying a firearm during a drug trafficking crime in violation of 18 U.S.C.§ 924(c), and one count of possessing a firearm after a felony conviction in violation of 18 U.S.C. § 922(g)(1). The district court denied Edmonds' motion to suppress all evidence seized from his person, the duffle bag, and any statements obtained after his arrest. United States v. Edmonds, 948 F. Supp. 562 (E.D. Va. 1996). Edmonds then conditionally pled guilty to all four counts of the indictment pursuant to Fed. R. Crim. P. 11. He reserved the right to appeal the denial of his motion to suppress and to appeal any illegal sentence. Due to Edmonds' criminal history, the district court classified him as a career offender for sentencing purposes. See U.S.S.G. § 4B1.1. The court sentenced Edmonds to 322 months incarceration plus five years supervised release and imposed a $400 special assessment.

II.

Edmonds contends that the district court erroneously denied his motion to suppress. The district court found Officer Kantor's conduct lawful under the principles enunciated in Terry v. Ohio, 392 U.S. 1 (1968). In upholding the initial stop, the district court found that the circumstances gave "rise to articulable, reasonable suspicion that some sort of criminal activity was afoot." Edmonds, 948 F. Supp. at 565. The district court also found that the subsequent search was a "limited and reasonable intrusion under the circumstances." Id. at 566. Edmonds concedes that Officer Kantor's initial stop was lawful under Terry but contends that Officer Kantor violated his Fourth Amendment rights when he requested Edmonds to lift his shirt and then raised it himself. We disagree.

The Supreme Court in Terry made clear that police officers may conduct a protective search for weapons during the course of a lawful

4

investigatory stop. This search "allow[s] the officer to pursue his investigation without fear of violence . . . ." Adams v. Williams, 407 U.S. 143, 146 (1972). "So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose." Id. (citation and footnote omitted). In order to take this protective step, an officer need not be certain that the individual is armed. Terry, 392 U.S. at 27. Rather "the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Id. (citations omitted). We review the district court's ultimate finding of reasonable suspicion de novo but evaluate its factual findings only for clear error. Ornelas v. United States, 517 U.S. 690, 699 (1996); United States v. Sprinkle, 106 F.3d 613, 616-17 (4th Cir. 1997).

Courts reviewing a search under Terry must respect the officer's first-hand assessment of a potentially dangerous situation. The Supreme Court has instructed judges to give "due weight . . . to the specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience." Terry, 392 U.S. at 27 (citation omitted); accord Ornelas, 517 U.S. at 699. Of course an officer's inchoate suspicions or groundless hunches cannot justify a protective search. Terry, 392 U.S. at 27; Sprinkle , 106 F.3d at 617. But "a police officer views the facts through the lens of his police experience and expertise. The background facts provide a context for the historical facts, and when seen together yield inferences that deserve deference." Ornelas, 517 U.S. at 699.

In this case, several factors support Officer Kantor's limited search of Edmonds. Initially, the circumstances surrounding the encounter suggest that Officer Kantor had ample reason to fear for his safety. He was alone, outnumbered, and in a poorly lit alley. Edmonds tries to downplay the significance of these circumstances by conceding the lawfulness of the initial stop. Of course, reasonable suspicion to conduct a Terry stop does not automatically entitle the officer to conduct a protective search. But the circumstances surrounding a police encounter cannot be so easily assigned only to the stop or only to the search. See United States v. Cortez, 449 U.S. 411, 417-18 (1981); United States v. Taylor, 857 F.2d 210, 214 (4th Cir. 1988). Thus, this circuit repeatedly has looked to the dangerousness of a particular situ-

5

ation to uphold an officer's decision to frisk for weapons. See, e.g., United States v. Crittendon, 883 F.2d 326, 328-29 (4th Cir. 1989); United States v. Moore, 817 F.2d 1105, 1107-08 (4th Cir. 1987). For example, in Moore, we approved an officer's pat down of a suspect when "[t]he hour was late, the street was dark, the officer was alone, and the suspected crime was a burglary, a felony that often involves the use of weapons." 817 F.2d at 1108. The circumstances surrounding Officer Kantor's encounter with Edmonds are virtually indistinguishable from those in Moore. Indeed, Officer Kantor confronted a potentially more threatening situation than in Moore for, unlike the officer in that case, he also was outnumbered.

Furthermore, Officer Kantor believed he had come upon two automobile thieves, individuals who easily could become violent. Both the Supreme Court and this circuit have repeatedly approved protective searches where an officer suspects individuals of criminal activity that is likely to involve the use of weapons. See, e.g., Terry, 392 U.S. at 28 (robbery); United States v. Perrin, 45 F.3d 869, 873 (4th Cir. 1995) (selling drugs); Moore, 817 F.2d at 1108 (burglary). An auto thief interrupted in the course of committing a crime, no less than a burglar, could be expected to carry a weapon or tools on his person that might easily be employed against an officer. Officer Kantor's experience only confirmed this risk. Several incidents in Arlington County involving stolen cars had resulted in gunfire, and Officer Kantor personally had been involved in one such incident in a nearby town. Furthermore, given Officer Kantor's experiences with other auto thefts, the duffle bag strongly suggested that Edmonds might have been carrying a weapon or tool on his person when Officer Kantor confronted him. In light of the suspected crime, Officer Kantor "had ample reason to fear for his safety." Adams, 407 U.S. at 148 (footnote omitted); see United States v. Douglas , 964 F.2d 738, 740-41 (8th Cir. 1992) (upholding officer's protective search where defendant suspected of automobile break-in).

Finally, the intrusion in this case was a limited one. In evaluating the reasonableness of a search under Terry, we balance "the officer's interest in self-protection against the resulting intrusion upon [the suspect's] personal security." United States v. Baker, 78 F.3d 135, 138 (4th Cir. 1996). Directing Edmonds to lift his shirt allowed Officer Kantor to ensure his safety and keep the other suspect in constant

6

view. Such a request, as we noted in Baker, is "less intrusive than the patdown frisk sanctioned in Terry." Id. Raising the right corner of Edmonds' large, baggy T-shirt after three refusals likewise represented a sensible safety measure while only minimally intruding on Edmonds' personal security. See United States v. Hill, 545 F.2d 1191, 1193-94 (9th Cir. 1976) (per curiam); cf. Adams , 407 U.S. at 147-48. In light of the circumstances of the encounter and the suspected crime, Officer Kantor was fully justified in taking these measured steps to ensure his safety in a threatening situation. Accordingly, the district court properly denied Edmonds' motion to suppress.

III.

Edmonds also contests his classification as a career offender under the Sentencing Guidelines. The district court adopted the probation officer's recommendation to classify Edmonds as a career offender due to his two prior felony convictions. We agree with the district court and, thus, affirm the sentence.

The Sentencing Guidelines set out three requirements for classifying a defendant as a career offender. A defendant is a career offender if (1) he "was at least eighteen years old at the time [he] committed the instant offense of conviction"; (2) that offense "is a felony that is either a crime of violence or a controlled substance offense"; and (3) he "has at least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1. Edmonds raises no challenge with respect to the first two requirements. He disputes only whether he has the requisite prior felony convictions.

At the time he was sentenced for the present offenses, Edmonds had two prior felony convictions. On May 9, 1988, Edmonds fired a semi-automatic pistol at someone in a New York City subway station. He was arrested on the same day and later was convicted of attempted murder in the second degree. Subsequently, on October 31, 1988, Edmonds and a group of approximately twenty-four other accomplices attacked someone else in another New York City subway station. Edmonds later was arrested and convicted of robbery in the first degree. Both attempted murder and robbery constitute crimes of violence. Id. § 4B1.2 Application Note 1. Edmonds maintains, however, that these prior convictions do not satisfy the requirements for career

7

offender classification because the sentences should not be counted separately. See id. § 4B1.2(c) (career offender classification requires that sentences for at least two prior felony convictions be counted separately under § 4A1.1(a)-(c)). Specifically, he argues that the sentences resulted from offenses that formed "part of a single common scheme or plan" because both occurred in New York City subway stations in 1988. Id. § 4A1.2 Application Note 3.

We disagree. Prior sentences are counted separately if they were imposed in unrelated cases. U.S.S.G. § 4A1.2(a)(2). Application Note 3 of § 4A1.2 elaborates on when cases are related:

> Related Cases. Prior sentences are not considered related if they were for offenses that were separated by an intervening arrest (i.e., the defendant is arrested for the first offense prior to committing the second offense). Otherwise, prior sentences are considered related if they resulted from offenses that (1) occurred on the same occasion, (2) were part of a single common scheme or plan, or (3) were consolidated for trial or sentencing.

Application Note 3 exposes the flaw in Edmonds' argument. It directs that prior sentences are not to be considered related where the offenses are separated by an intervening arrest. See U.S.S.G. App. C n. 382 (Nov. 1, 1992) (Application Note 3 specifically amended "to provide that cases separated by an intervening arrest for one of the offenses are not treated as related cases."). Thus, a court cannot consider whether two offenses might form part of a single common scheme or plan when an intervening arrest separates them. We note several other circuits have routinely held that prior sentences separated by an intervening arrest are counted separately. United States v. Boonphakdee, 40 F.3d 538, 544 (2d Cir. 1994); United States v. Hallman, 23 F.3d 821, 824-25 (3d Cir. 1994); United States v. Springs, 17 F.3d 192, 195-96 (7th Cir. 1994); United States v. Aguilera, 48 F.3d 327, 330 (8th Cir. 1995); United States v. Gallegos-Gonzalez, 3 F.3d 325, 326-28 (9th Cir. 1993).

Edmonds' prior sentences must be counted separately. Edmonds shot someone on the New York subway on May 9, 1988; he was arrested later that same day. Subsequently, in October 1988, Edmonds

8

participated in the attack that led to his robbery conviction. The intervening arrest between the shooting and the attack compels the conclusion that Edmonds' sentences for these two convictions must be counted separately. Moreover, Edmonds' two offenses do not form part of a single common scheme or plan merely because they occurred in the same year on the New York City subway system; the substantive offenses are not the same, involved different victims, were not solved during a single investigation, did not share a similar modus operandi, and appear to have had different motives. See United States v. Singleton, 107 F.3d 1091, 1104 (4th Cir. 1997), cert. denied, 118 S. Ct. 84 (1997); United States v. Breckenridge, 93 F.3d 132, 138-40 (4th Cir. 1996) Accordingly, Edmonds has two prior felony convictions for crimes of violence, and the district court properly classified him as a career offender for sentencing.

IV.

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

9